

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-18-1996

# In Re: Westinghouse

Precedential or Non-Precedential:

Docket 95-3156

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"In Re: Westinghouse" (1996). *1996 Decisions*. Paper 106.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/106

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 95-3156
_____

In Re:  WESTINGHOUSE SECURITIES LITIGATION

MARGARET ALESSI, GLORIA BERTINATO, MICHAEL C.
CHRISTNER, ANNA MARIE EROSHEVICH, TOBY FEUER,
KANWAL K. GUPTA, M.D., MATTHEW HARLIB, STANLEY
HERSHFANG, ARNOLD M. JACOB, LOUISE JACOB, DAVID
JAROSLAWICZ, DAVID KIRSCHNER, NATHAN
KLEINHANDLER, GERRY KRIM, PETER LAGORIO, NELSON
LOVINS, DONALD McLENNAN, JACOB JOSEPH MILLER, DR.
ALEXANDER MILLER, THOMAS MITCHELL, EDWARD
MURABITO, MICHAEL E. NOGAY, JOSEPH RASCHAK,
RICHARD SCHWARTZCHILD, DR. MICHAEL SLAVIN, DR.
MICHAEL SOLOMON, SELMA SOLOMON, SPRING CREEK
CARDIOMEDICAL CENTER, RUTH STEPAK, JIM THOMPSON,
PATRICIA J. VANARTSDALEN, ALBERT ZUCKER,

Appellants

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
(D.C. Civil No. 91-00354)
_____

Argued:  November 2, 1995
Before:  NYGAARD, ALITO, and SAROKIN, Circuit Judges

(Opinion Filed: July 18, l996)

_____

ARTHUR N. ABBEY (Argued)
JOSHUA N. RUBIN
ABBEY & ELLIS
212 East 39th Street
New York, NY   10016

JULES BRODY
MELISSA R. EMERT
STULL, STULL & BRODY
6 East 45th Street
New York, NY 10017

HOWARD A. SPECTER
DAVID J. MANOGUE
SPECTER LAW OFFICES, P.C.
The Koppers Building, 26th Floor
Pittsburgh, PA 15219

JEFFREY W. GOLAN
GERALD J. RODOS
BARRACK, RODOS & BACINE
2001 Market Street
3300 Two Commerce Square
Philadelphia, PA  19103

RICHARD A. FINBERG
BERGER, KAPETAN, MEYERS, ROSEN,
LOUIK & RAIZMAN
200 Frick Building
Pittsburgh, PA  15219

DONALD P. ALEXANDER
GREENFIELD & RIFKIN
344 West Lancaster Avenue
P. O. Box 259
Haverford, PA 19041

Attorneys for Appellants

ROBERT E. ZIMET   (Argued)
JOSEPH GUGLIELMELLI
MAURA B. GRINALDS
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM
919 Third Avenue
New York, NY  10022

J. TOMLINSON FORT
REED SMITH SHAW & McCLAY
James H. Reed Bldg.
435 Sixth Avenue
Pittsburgh, PA  15319

Attorneys for Appellees, Shearson Lehman Brothers Inc., Goldman,
Sachs & Co., Lazard Freres & Co. Lehman Brothers International,
Ltd., Goldman Sachs International, Ltd. and Lazard Brothers &
Co., Ltd.

DENNIS J. BLOCK   (Argued)
STEPHEN A. RADIN
ROBERT F. CARANGELO, JR.
MARY LOU PETERS,
WEIL, GOTSHAL & MANGES
767 Fifth Avenue

New York, NY   10153

JOSEPH A. KATARINCIC
KATARINCIC & SALMON
2600 CNG Tower
625 Liberty Avenue
Pittsburgh, PA 15222

Of Counsel:

WILLIAM F. STOLL, JR.
HENRY W. EWALT
ROBERT L. KAUFMAN
VANESSA J. BROWN
Westinghouse Electric
  Corporation Law Department
Six Gateway Center
Pittsburgh, PA  15222


Attorneys for Appellees, Robert E. Faust, Warren H. Hollinshead,
  Paul E. Lego, William A. Powe, Robert F. Pugliese, Theodore
Stern, Westinghouse Electric Corporation, Westinghouse Financial
        Services, Inc. and Westinghouse Credit Corporation

ELDON OLSON
General Counsel
RODMAN W. BENEDICT
Associate General Counsel
Price Waterhouse LLP
1285 Avenue of the Americas
New York, New York  10019

FRANK CICERO, JR.
ROBERT J. KOPECKY  (Argued)
JEFFREY L. WILLIAN
KIRKLAND & ELLIS
200 East Randolph Drive
Chicago, IL 60601

Of Counsel:

ARTHUR J. SCHWAB
JAMES D. MORTON
BUCHANAN INGERSOLL
600 Grant Street
Pittsburgh, PA  15219
(Of Counsel)

        Attorneys for Appellee, Price Waterhouse LLP


ALITO, Circuit Judge:

This is an appeal from three orders dismissing all of the plaintiffs' claims in a consolidated class action securities fraud complaint. The orders were based on Federal Rules of Civil Procedure 8, 9(b), and 12(b)(6). We affirm in part, reverse in part, and remand for further proceedings.

I.

A. Plaintiffs in this case are all purchasers of publicly traded Westinghouse Electric Corporation ("Westinghouse") securities. Plaintiffs purchased Westinghouse common stock between March 28, 1989, and October 22, 1991 ("the class period").

Defendants include Westinghouse, Westinghouse Financial Services, Inc. ("WFSI") (a wholly owned subsidiary of Westinghouse), Westinghouse Credit Corporation ("WCC") (which is owned by WFSI), and certain directors and senior officers of these companies (the "individual defendants"). (We will refer to the above defendants collectively as the "Westinghouse defendants.") The other defendants are Price Waterhouse (the independent accountant for the Westinghouse companies), and a proposed defendant class of underwriters (the "underwriter defendants") involved in a May 1991 public offering of Westinghouse common stock.

B. The relevant allegations of plaintiffs' complaint, which were set forth in detail by the district court, see In re Westinghouse Securities Litigation, 832 F. Supp. 948 (W.D. Pa. 1993), may be summarized as follows. During the 1980's, WCC grew rapidly by committing substantial funds to the financing of real estate developments and highly leveraged transactions. In the late 1980's, however, WCC experienced an increase in defaults in its real estate loans and in delinquencies in other transactions. As a result, WCC suffered billions of dollars of losses, and the Westinghouse defendants feared a drop in WCC's commercial paper ratings. To protect those ratings, they concealed the losses, which allegedly totalled between $2.6 and $5.3 billion, through improper accounting and reporting techniques.

Prior to February 1991, Westinghouse management decided that WCC needed a cash infusion if it was to maintain its commercial paper ratings. Westinghouse developed a major restructuring plan, which it announced on February 27, 1991. Under that plan, Westinghouse decided to "downsize" WCC by selling or restructuring nearly one-third of its assets that had previously been held on a long-term basis. Westinghouse knew that selling and restructuring so many non-performing or underperforming assets in the market that existed at the time would result in significant losses. Westinghouse thus took a $975 million pre-tax charge against fourth quarter 1990 earnings to be applied to loan loss reserves and to cover estimated losses. The press release and other documents issued by Westinghouse in connection with these actions stated that they decisively addressed WFSI's and WCC's problems. Plaintiffs allege that these statements were materially false when made in that defendants knew (or recklessly disregarded facts

demonstrating) that reserves remained inadequate as of that time. Plaintiffs point to a statement by James Focareta, WCC's president from early 1990 to early 1991, in which he acknowledged that the $975 million writeoff was known to be insufficient. Focareta said: "The number that was used ($975 million) was a number developed for something else . . . .  Every Westinghouse credit manager knew that was not sufficient . . . .  The Keystone Kops were involved, clearly."  App. 1134.

Plaintiffs assert that Westinghouse further compounded the harm to investors by raising $500 million through a May 1991 stock offering.  Westinghouse offered 19 million shares of its common stock for sale to the investing public at $26.50 per share on May 9, 1991.  Plaintiffs allege that the Prospectus and Registration Statement filed with the Securities and Exchange Commission ("SEC") in May 1991, as well as other documents (including the Annual Report) that were incorporated by reference therein, contained material misrepresentations and omissions.

In October 1991, Westinghouse determined and announced that the restructuring plan had to be accelerated.  Additional assets of $3.1 billion were designated as being held for sale or restructuring.  Westinghouse took a $1.68 billion pre-tax charge in anticipation of further losses it expected to suffer. Plaintiffs allege that defendants knew as early as October 1990 that a charge of this magnitude was inevitable and that defendants' statements to the contrary over the course of that year and contemporaneous with the October 1991 announcement were materially false.  Plaintiffs claim that they paid artificially inflated prices of from $21.75 to $39.375 per share in contrast to Westinghouse's closing price of $15.875 after the announcement of the October 1991 charge.

C.  The first of the class action complaints consolidated herein was filed in February 1991, just after Westinghouse announced the restructuring plan.  In May 1991, the magistrate judge granted plaintiffs limited discovery to prepare a consolidated complaint.  In March 1992, the magistrate judge ordered that Westinghouse make available to plaintiffs documents related to over 500 active investment files.  Plaintiffs filed the Consolidated Amended Class Action Complaint ("the first amended complaint") in June 1992.

The first amended complaint alleged violations of the following provisions:  sections 10(b) and 20 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C.    78j(b), 78t, and Rule 10b-5, 17 C.F.R.   240.10b-5, against all defendants (count I); sections 11 and 15 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C.    77k, 77o, against all defendants (count II); section 12(2) of the Securities Act, 15 U.S.C. 77l(2), against all defendants except Price Waterhouse (count III); separate violations of sections 11 and 15 against all defendants except for the underwriter defendants (count IV); separate violations of section 12(2) against the Westinghouse defendants (count V); and negligent misrepresentation against all defendants (count VI).

In August 1992, defendants moved to dismiss all counts of the first amended complaint under Federal Rules of Civil

Procedure 9(b) and 12(b)(6). In an opinion and order entered on July 29, 1993, the district court granted defendants' motion. See In re Westinghouse Securities Litigation, 832 F. Supp. 948 (W.D. Pa. 1993) (Westinghouse I). Count I and a small piece of count VI were dismissed without prejudice to repleading, while counts II-V and most of count VI were dismissed with prejudice.

Plaintiffs filed the Second Consolidated Amended Class Action Complaint ("the second amended complaint") in September 1993. Plaintiffs repled all of their claims, including those that had been dismissed with prejudice (stating that such claims were being repled verbatim solely to preserve their appellate rights). In December 1993, defendants moved to dismiss the second amended complaint under Federal Rules of Civil Procedure 8, 9(b), and 12(b)(6). In March 1994, plaintiffs cross-moved to supplement the second amended complaint.

In January 1995, the district court granted defendants' motion to dismiss the second amended complaint. See In re Westinghouse Securities Litigation, Civ. No. 91-354, Opinion and Order entered January 23, 1995, App. 310-46 (Westinghouse II). Counts II-VI were dismissed without discussion, since they had already been dismissed with prejudice in Westinghouse I. Many of the claims in count I were dismissed with prejudice, and the remainder of the claims in count I were dismissed without prejudice to repleading in accordance with Rule 8. The district court also denied as moot plaintiffs' motion to supplement the second amended complaint.

Plaintiffs filed a "Notice of Intention to Stand on Second Consolidated Amended Class Action Complaint," in which they informed the district court that they would not be amending the complaint; rather, plaintiffs stated that they were going to "stand" on the complaint and seek immediate appellate review. App. 347. The district court then dismissed plaintiffs' remaining claims from count I with prejudice and closed the case. See App. 350-51 (Memorandum Order entered March 1, 1995). This appeal followed.

On appeal, plaintiffs argue that the district court improperly dismissed various of their section 10(b) claims under Rule 8; misapplied the "bespeaks caution" doctrine; improperly found that plaintiffs failed to plead fraud with particularity; mistakenly found that plaintiffs failed to plead materiality; and erroneously dismissed the section 12(2) claims. Plaintiffs also argue that the district court should have granted their motion to supplement the second amended complaint. Finally, plaintiffs argue that this case should be assigned to a new district judge.

II.

A. We turn first to plaintiffs' challenge to the district court's Rule 8 dismissal. Rule 8(a) provides that any pleading that includes a claim for relief shall contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 8(e) further provides that "[e]ach averment of a pleading shall be simple, concise, and direct." Fed. R. Civ. P. 8(e)(1). "Taken together, Rules 8(a) and 8(e)(1) underscore the emphasis placed on clarity

and brevity by the federal pleading rules."  5 Wright & Miller, Federal Practice and Procedure  1217 at 169 (2d ed. 1990).

We review the district court's decision to dismiss claims under Rule 8 for an abuse of discretion.  E.g., Kuehl v. F.D.I.C., 8 F.3d 905, 908 (1st Cir. 1993), cert. denied, 114 S. Ct. 1545 (1994); 5 Wright & Miller,  1217 at 175.  "It is well settled that the question on review `is not whether we would have imposed a more lenient penalty had we been sitting in the trial judge's place, but whether the trial judge abused his discretion in imposing the penalty he did.'"  Kuehl v. F.D.I.C., 8 F.3d at 908-09 (citation omitted).

The district court's January 1995 opinion and order provided that "with respect to those aspects of Count One that survive the instant Opinion and Order, plaintiffs are granted 30 days from this date within which to replead in conformity with the requirements of Rule 8."  Westinghouse II, Op. at 21, App. 330; Order at 35, App. 344.  The district court added that "[f]ailure to comply with this Order will result in the dismissal of plaintiffs' claims with prejudice."  Id.

On February 21, 1995, plaintiffs filed a "Notice of Intention to Stand on Second Consolidated Amended Class Action Complaint."  Plaintiffs stated as follows:

Plaintiffs have carefully weighed the merits of repleading against seeking immediate appellate review.  They respectfully give notice of their intention to stand on the Complaint.  See, Shapiro v. UJB Financial Corp., 964 F.2d 272 (3d Cir. 1992).

App. 348.  The district court then dismissed with prejudice all of plaintiffs' remaining claims, stating as follows:

On January 20, 1995, this Court dismissed plaintiffs' Second Amended Class Action Complaint.  As that Opinion and Order explained, with respect to those aspects of Count One of plaintiffs' Second Amended Complaint that survived the January 20, 1995 Opinion and Order, plaintiffs were granted 30 days from that date within which to replead in conformity with the requirements of Rule 8 of the Federal Rules of Civil Procedure.  The Opinion and Order specifically stated that failure to replead within 30 days would result in the dismissal of plaintiffs' claims with prejudice.

Instead of filing an amended complaint, plaintiffs filed a Notice of Intention to Stand on Second Consolidated Amended Class Action Complaint, indicating that they had "carefully weighed the merits of repleading against seeking immediate appellate review."

Accordingly, . . . it is hereby ORDERED

that all remaining claims in plaintiffs'
Second Amended Class Action Complaint are
dismissed with prejudice.

App. 350-51 (Memorandum Order entered 3/1/95).

B. Plaintiffs argue first that the Rule 8 dismissal without prejudice in Westinghouse II should be reversed because the district court imposed inconsistent pleading standards on them. Plaintiffs contend that the Westinghouse I opinion required them to draft the second amended complaint with tremendous specificity. They argue that the district court in effect required that they violate Rule 8 (if they violated Rule 8 at all) in order to comply with Rule 9(b). See Plfs' Br. at 44-46. We disagree.

It is well settled that "the particularity demands of pleading fraud under Rule 9(b) in no way negate the commands of Rule 8." Vicom, Inc. v. Harbridge Merchant Services, Inc., 20 F.3d 771, 776 (7th Cir. 1994) (citations omitted); see generally 5 Wright & Miller, 1281 at 520-21 (pleading fraud with particularity under Rule 9(b) should be done consistently with the general philosophy of Rule 8); 2A Moore's Federal Practice 8.13, at 8-58 (2d ed. 1995) (the requirements of Rule 8 apply "even where the Rules command particularity, as in the pleading of fraud under Rule 9(b)") (footnote omitted).

Having reviewed plaintiffs' second amended complaint, we cannot say that the district court abused its discretion in dismissing the viable portion of count I, without prejudice to repleading, pursuant to Rule 8. The second amended complaint is unnecessarily complicated and verbose. The text of the complaint rambles for more than 600 paragraphs and 240 pages, including a 50-plus page "overview" of the alleged wrongful conduct. The district court, through the two rounds of difficult motions, had narrowed plaintiffs' claims. The court then ordered plaintiffs to submit a third amended complaint containing only those allegations relevant to what were, in the court's view, the remaining viable claims. This does not seem to us to constitute an abuse of discretion; indeed, it makes a tremendous amount of sense. See generally In re Glenfed, Inc. Securities Litigation, 42 F.3d 1541, 1544 (9th Cir. 1994) (en banc) ("We see nothing to prevent the district court, on remand, from requiring, as a matter of prudent case management, that plaintiffs streamline and reorganize the complaint before allowing it to serve as the document controlling discovery, or, indeed, before requiring defendants to file an answer.").

C. We further hold that the district court did not abuse its discretion when it dismissed with prejudice the otherwise viable claims from count I following plaintiffs' decision not to replead those claims in accordance with Rule 8. The district court expressly warned plaintiffs that failure to replead the remaining claims in compliance with Rule 8 would result in the dismissal of those claims. The dismissal with prejudice that followed plaintiffs' decision not to amend was not an abuse of discretion. See, e.g., 5 Wright & Miller, 1217 at 178 (dismissal with prejudice appropriate where party refuses to file an amended and simplified pleading). As we recently stated

in a different but analogous context, "it is difficult to conceive of what other course the court could have followed." Spain v. Gallegos, 26 F.3d 439, 455 (3d Cir. 1994) (affirming dismissal with prejudice where plaintiff refused to go forward with remaining claims).

D. Defendants attempt to go further. They argue that all of plaintiffs' claims –– including those that had been dismissed with prejudice under Rules 9(b) and 12(b)(6) in Westinghouse I and Westinghouse II –– were also dismissed with prejudice on Rule 8 grounds and that this dismissal was proper. Thus, according to defendants,

> [e]ven if this Court were to reverse any portion of the District Court's ruling dismissing portions of [the second amended complaint] with prejudice on grounds other than Rule 8, plaintiffs still would be bound by their irrevocable election to stand on their Second Amended Complaint, which still will constitute "a flagrant violation of the requirements of Rule 8."

West. Br. at 20 (quoting Westinghouse II, Op. at 20, App. 329). There is slim support for defendants' argument in Westinghouse II, where the court stated that "plaintiffs' Second Amended Complaint shall be dismissed in its entirety for failure to plead in conformity with the requirements of Rule 8." Op. at 21, App. 330. On the whole, however, we do not agree with defendants' characterization of what the district court did. As we understand the record, the district court, having already dismissed certain claims with prejudice on non–Rule 8 grounds in Westinghouse I and Westinghouse II, did not later dismiss those claims again for failure to comply with Rule 8.

First, we note that the district court specifically ordered plaintiffs not to include in the third amended complaint any claims except for those that survived Westinghouse II. Westinghouse II, Op. at 21, App. 330; Order at 35, App. 344. Thus, even if plaintiffs had repled and filed a third amended complaint, the claims that had been dismissed on grounds other than Rule 8 could not have been included. Because plaintiffs were permitted to replead only those claims that survived Westinghouse II, it seems implausible to suggest that their decision not to replead could have had any effect on any claims other than those that the district court sustained in Westinghouse II.

Second, the district court's Memorandum Order of March 1, 1995, is the only order in the record that dismisses any claim or claims with prejudice under Rule 8, and that order quite clearly applies to only those claims that had survived dismissal with prejudice on other grounds in Westinghouse I and Westinghouse II. That order explicitly states that "it is hereby ORDERED that all remaining claims in plaintiffs' Second Amended Class Action Complaint are dismissed with prejudice." App. 350–51 (emphasis added). Thus, we reject defendants' argument that either Westinghouse II or the court's March 1, 1995 Memorandum Order dismissed any claims with prejudice under Rule 8 that had

already been dismissed on their merits.

E. Defendants next argue that if we do not hold that all of the plaintiffs' claims were properly dismissed under Rule 8, we should nevertheless decline to review the dismissal of claims in Westinghouse I and Westinghouse II on non-Rule 8 grounds. Defendants contend that "interlocutory orders -- such as the District Court's July 1993 and January 1995 Orders, which contain all of the District Court's non-Rule 8 rulings appealed by plaintiffs -- do not merge into and are not encompassed by final orders where plaintiffs engage in a strategy intended to create an avenue for this Court to reach issues not subject to interlocutory appeals." West. Br. at 21 (emphasis in original). Defendants rely on Marshall v. Sielaff, 492 F.2d 917 (3d Cir. 1974) (affirming dismissal for lack of prosecution and choosing not to reach underlying substantive issue decided in prior interlocutory order) and Sullivan v. Pacific Indem. Co., 566 F.2d 444 (3d Cir. 1977) (dismissing for lack of an appealable order where appellant did not challenge dismissal for failure to prosecute but attempted to appeal prior interlocutory order denying motion for class certification). Plaintiffs counter that they followed the procedure expressly approved by this court in Shapiro v. UJB Financial Corp., 964 F.2d at 278-79 ("a plaintiff can convert a dismissal with leave to amend into a final order by electing to stand upon the original complaint") (citing Borelli v. City of Reading, 532 F.2d 950, 951-52 (3d Cir. 1976)). SeePlfs' Rep. Br. at 8. We find the defendants' argument unpersuasive.

First, we reject the suggestion (see Westinghouse Br. at 20) that we lack jurisdiction to review the district court's rulings in Westinghouse I and Westinghouse II. "The principle is well-settled in this circuit that an order dismissing a complaint without prejudice is not a final and appealable order, unless the plaintiff no longer can amend the complaint because, for example, the statute of limitations has run, or the plaintiff has elected to stand on the complaint." Newark Branch, N.A.A.C.P. v. Harrison, 907 F.2d 1408, 1416-17 (3d Cir. 1990) (citations and footnotes omitted) (emphasis added); see also Bethel v. McAllister Brothers, Inc., 81 F.3d 376, 381 (3d Cir. 1996); Deutsch v. United States, 67 F.3d 1080, 1083 (3d Cir. 1995); Welch v. Folsom, 925 F.2d 666, 668 (3d Cir. 1991); Trevino-Barton v. Pittsburgh National Bank, 919 F.2d 874, 877-78 (3d Cir. 1990). In UJB, the plaintiffs stood on their complaint with respect to claims that had been dismissed without prejudice under Rule 9(b). They argued that their allegations satisfied Rule 9(b) and that they were not required to make any further amendments. This court concluded that it had jurisdiction to consider the merits of the Rule 9(b) dismissal and explained:

> [W]e have held that a plaintiff can convert a
> dismissal with leave to amend into a final
> order by electing to stand upon the original
> complaint. See, e.g., Borelli v. City of
> Reading, 532 F.2d 950, 951-52 (3d Cir. 1976)
> ("Only if the plaintiff . . . declares his
> intention to stand on his complaint . . . the

> order becomes final and appealable").
> Plaintiffs here stood on their complaint, but defendants contend that this was not enough. They maintain that we lack jurisdiction because plaintiffs failed to obtain an explicit dismissal with prejudice. We do not agree.

964 F.2d at 278 (alterations in UJB). The court thus considered whether plaintiffs' allegations that had been dismissed without prejudice actually satisfied Rule 9(b).

Here, when plaintiffs elected to stand on the second amended complaint rather than replead the remaining claims in compliance with Rule 8, the remaining claims were dismissed with prejudice, and the case was closed in the district court. Under the authorities discussed above, there is no doubt that the district court's dismissal of the case with prejudice was a reviewable, final order. We therefore reject the defendants' contentions to the extent that they challenge our appellate jurisdiction.

Furthermore, we see no prudential grounds for declining to review the merits of the district court's dismissal of claims on non-Rule 8 grounds in Westinghouse I and Westinghouse II. Under the "merger rule," prior interlocutory orders merge with the final judgment in a case, and the interlocutory orders (to the extent that they affect the final judgment) may be reviewed on appeal from the final order. See, e.g., Silver v. Mendel, 894 F.2d 598, 601 (3d Cir.), cert. denied, 496 U.S. 926 (1990); Elfman Motors, Inc. v. Chrysler Corp., 567 F.2d 1252, 1253 (3d Cir. 1977) ("the appeal from a final judgment draws in question all prior non-final orders and rulings which produced the judgment") (citation omitted). Under this rule, the district court's orders in Westinghouse I and Westinghouse II merged with the final order dismissing the remaining claims with prejudice and closing the case and thus would ordinarily be subject to review on appeal from the final order.

Defendants, however, invoke an exception to the merger rule pursuant to which courts decline to reach prior interlocutory rulings where to do so would undermine the policy against piecemeal appeals. See generally, e.g., Sere v. Board of Trustees of Univ. of Illinois, 852 F.2d 285, 288 (7th Cir. 1988) ("Although the general rule is that rulings on interlocutory orders are encompassed within a subsequent final judgment and may be reviewed as part of that judgment, the rule is inapplicable where adherence would reward a party for dilatory and bad faith tactics.") (citations omitted). The line of cases relied upon by defendants stands for the proposition that a dismissal with prejudice for failure to prosecute frequently bars review of previously entered interlocutory orders. Without addressing the potential scope of this exception to the merger rule, see Fassett v. Delta Kappa Epsilon (New York), 807 F.2d 1150, 1155 n.6 (3d Cir. 1986) (dictum declining to extend Sullivan holding beyond class certification context), cert. denied, 481 U.S. 1070 (1987), we conclude that the exception has no application here. The failure-to-prosecute cases upon which defendants rely are

distinguishable from plaintiffs' decision in this case to stand on the second amended complaint -- a decision that we regard as squarely governed by our holding in UJB. We are confident that our review of the merits of the orders in Westinghouse I and Westinghouse II will not "invite the inundation of appellate dockets with requests for review of interlocutory orders [or] undermine the ability of trial judges to achieve the orderly and expeditious disposition of cases." Cf. Marshall v. Sielaff, 492 F.2d at 919.

To summarize our holdings thus far, we have concluded that the district court did not err in dismissing with prejudice under Rule 8 those claims that were not dismissed with prejudice on other grounds in Westinghouse I and Westinghouse II; that the claims that were dismissed with prejudice in Westinghouse I and Westinghouse II on non-Rule 8 grounds were not later dismissed with prejudice under Rule 8 as well; and that it is jurisdictionally proper and appropriate for us to consider whether the district court erred in dismissing these claims pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) in Westinghouse I and Westinghouse II.

We exercise plenary review over these dismissals. See, e.g., UJB, 964 F.2d at 279. Moreover, we must accept as true plaintiffs' factual allegations, and we may affirm the district court's dismissals only if it appears certain that plaintiffs can prove no set of facts entitling them to relief. Id. at 279-80 (citation omitted).

In ruling on the two rounds of motions, the district court considered various undisputedly authentic documents attached to plaintiffs' complaint or defendants' motions to dismiss. Because plaintiffs' claims are based upon these documents, they were properly considered as part of defendants' motions to dismiss. E.g., In re Donald J. Trump Casino Securities Litigation, 7 F.3d 357, 368 n.9 (3d Cir. 1993), cert.denied, 114 S. Ct. 1219 (1994) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993), cert. denied, 114 S. Ct. 687 (1994)).

III.

Plaintiffs' claims under section 10(b) of the Exchange Act and under sections 11 and 12(2) of the Securities Act all require, among other things, that plaintiffs allege a materialmisstatement or omission. See Trump, 7 F.3d at 368 n.10. Defendants argued in the district court that any misstatements they may have made with respect to the adequacy of WCC's loan loss reserves were not material. Defendants contended, under the "bespeaks caution" doctrine, that their cautionary language regarding the adequacy of WCC's loan loss reserves rendered immaterial any alleged misrepresentations. The district court largely accepted this argument. In Westinghouse I, the court dismissed most of the allegations regarding loan loss reserves contained in the first amended complaint, see 832 F. Supp. at 973-77, 985-86, and in Westinghouse II, the court clarified that no cautionary language immunized defendants' alleged misstatements occurring prior to February 27, 1991. Thus, under

the two opinions and orders, the allegations regarding alleged misstatements about loan loss reserves that were made on or after February 27, 1991, were dismissed under the "bespeaks caution" doctrine.  We now turn to plaintiffs' challenge to this dismissal.

As we explained in Trump, "`bespeaks caution' is essentially shorthand for the well-established principle that a statement or omission must be considered in context, so that accompanying statements may render it immaterial as a matter of law."  7 F.3d at 364.  We described the doctrine as follows:

> The application of bespeaks caution depends on the specific text of the offering document or other communication at issue, i.e., courts must assess the communication on a case-by-case basis.  Nevertheless, we can state as a general matter that, when an offering document's forecasts, opinions or projections are accompanied by meaningful cautionary statements, the forward-looking statements will not form the basis for a securities fraud claim if those statements did not affect the "total mix" of information the document provided investors.  In other words, cautionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law.
>
> . . . Of course, a vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation.  To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge.
>
> . . . [T]he prospectus here truly bespeaks caution because, not only does the prospectus generally convey the riskiness of the investment, but its warnings and cautionary language directly address the substance of the statement the plaintiffs challenge.

7 F.3d at 371-72 (citation omitted); see also Kline v. First Western Government Securities, Inc., 24 F.3d 480, 489 (3d Cir.) ("Trump requires that the language bespeaking caution relate directly to that by which plaintiffs claim to have been misled.") (citation omitted), cert. denied, 115 S. Ct. 613 (1994).  In Trump, we concluded that given the "extensive yet specific cautionary language, a reasonable factfinder could not conclude" that the alleged misrepresentation "would influence a reasonable

investor's investment decision."  Trump, 7 F.3d at 369; see alsoid. at 373 ("no reasonable jury could conclude that the subject projection materially influenced a reasonable investor").

Plaintiffs' loan loss reserves claims under sections 11 and 12(2) are based solely on alleged misstatements in Westinghouse's May 1991 Registration Statement and Prospectus and documents incorporated therein.  The reserves claims under section 10(b) are based upon those documents as well as other alleged misstatements addressing the adequacy of the loan loss reserves.  The essence of plaintiffs' allegations is that defendants knowingly or recklessly misrepresented (i) the adequacy of WCC's loan loss reserves and (ii) compliance with Generally Accepted Accounting Principles ("GAAP") in establishing the reserves.

With regard to plaintiffs' section 10(b) claims, the district court concluded that the warnings, "far from being Pollyanish, pointed to still darker clouds on the horizon if the economy generally, and real estate markets specifically, did not improve. . . .  Accordingly, despite sufficient allegations of scienter and materiality, defendants' alleged misrepresentations about the adequacy of Westinghouse and WCC loan loss reserves were so strongly qualified by clear warnings about the future that plaintiffs' causes of action . . . must be dismissed under the `bespeaks caution' doctrine."  832 F. Supp. at 976.  The court reached a similar conclusion with regard to plaintiffs' claims under sections 11 and 12(2).  See id. at 985–86 (finding that Westinghouse's prospectus "`virtually bristles with warnings'" and that its statements regarding the adequacy of its reserves were "remarkably equivocal") (citation omitted).

Defendants contend that all of the above claims were properly dismissed because any alleged misstatements are immaterial when considered in the context of cautionary language contained in various filings with the SEC.  See Westinghouse I, 832 F. Supp. at 974–76 (summarizing non–prospectus warnings and quoting from numerous Westinghouse filings).  In defense of the district court's decision, Westinghouse's brief highlights the following excerpts from the May 1991 Registration Statement and Prospectus, which typify the warnings on which the defendants rely:

> As part of the reclassification of the $3.4 billion of assets, the Company reclassified for sale approximately $654 million of marketable securities. . . .  This portfolio will be liquidated as soon as practicable; however, future deterioration in market value could result in additional losses prior to sale . . . .
>
> The $3.4 billion in higher–risk and underperforming assets reclassified as held for sale or restructuring included $2.4 billion in receivables.  As such, these receivables had and continue to have a high

probability of becoming non-earning assetsduring the expected period of liquidation . .
. .

Of the $2.4 billion of receivables held for sale or restructuring, at March 31, 1991, approximately $700 million were non-earning, up from $481 million at December 31, 1990. . . . Real estate owned in assets held for sale or restructuring was approximately $335 million at March 31, 1991, up from $285 million at December 31, 1990.

Of the remaining $8.0 billion in receivables in WFSI's ongoing portfolio, non-earning receivables totaled approximately $180 million at March 31, 1991, up from $71 million at December 31, 1990.  Reduced earning receivables totaled approximately $725 million at March 31, 1991, up from $605 million at December 31, 1990.  Real estate owned was approximately $175 million at March 31, 1991, up from $85 million at December 31, 1990.

At March 31, 1991, WFSI's valuation allowances related to assets held for sale or restructuring, and the allowances for credit losses related to the assets in the ongoing portfolio, amounted to $1.013 million and $306 million, respectively.  Management believes that under current economic conditions such allowances should be adequate to cover future losses that may occur. However, a further or more prolonged downturn in the economy or in the real estate, securities or certain other markets could have a negative effect on the ability of WFSI's borrowers to repay and on asset values generally and could result in additional increases in non-earnings assets, restructured loans and, ultimately, increases in allowances for losses in both assets held for sale or restructuring and receivables in the balance of WFSI's portfolio.

Westinghouse Br. at 29-30 (quoting App. 748-49) (emphasis and ellipses in Westinghouse brief).

Plaintiffs argue that this and other similar cautionary language was insufficient because it implied, consistently with the alleged misstatements by Westinghouse officials, that defendants believed, as of February 1991 and thereafter, that the loan loss reserves were and would remain adequate "under current economic conditions."  Plaintiffs contend that defendants'

statements regarding the adequacy of the loan loss reserves were materially false when made because defendants knew that the reserves were and would remain inadequate, even without any future or prolonged economic downturn. Plaintiffs allege that Westinghouse management and other defendants knew that the February 1991 charge was inadequate to cover current and expected future losses. Plaintiffs assert that defendants knew that WCC's loan portfolio was overstated by between $2.6 billion and $5.3 billion immediately prior to the first writedown of $975 million in February 1991. Pointing to internal documents suggesting that Westinghouse believed that the $975 million charge was "credible" and "affordable," plaintiffs argue that defendants should have been concerned with whether the charge complied with GAAP. Plaintiffs also point to the statement by former WCC President James Focareta, in which he allegedly acknowledged that Westinghouse officials knew in February 1991 that the $975 million charge was insufficient. See App. 1134.

Having carefully reviewed the cautionary language on which the defendants and the district court relied, we find that these statements do not sufficiently counter the alleged misrepresentations, i.e., that the defendants knowingly or recklessly misrepresented the adequacy of the loan loss reserves and compliance with GAAP. If, as plaintiffs say, defendants knowingly or recklessly misrepresented the adequacy of the loss reserves to protect against known losses and known risks in light of the then-current economic conditions, it follows that defendants' cautionary statements about the future did not render those misrepresentations immaterial. In our view, a reasonable investor would be very interested in knowing, not merely that future economic developments might cause further losses, but that (as plaintiffs allege) current reserves were known to be insufficient under current economic conditions. A reasonable investor might well be willing to take some chances with regard to the future of the economy, but might be quite unwilling to invest in a company that knew that its reserves were insufficient under current conditions and knew it would be taking another major write-down in the near future (as plaintiffs allege). Thus, notwithstanding the cautionary language stressed by defendants, we think that there is a substantial likelihood that defendants' alleged misrepresentations -- i.e., that the loan loss reserves were established in compliance with GAAP and were believed to be adequate to cover expected future losses given the then-existing economic conditions -- would have assumed actual significance to a reasonable investor contemplating the purchase of securities. We therefore cannot say that the cautionary language rendered the alleged misrepresentations immaterial as a matter of law. See Kline, 24 F.3d at 489 (rejecting bespeaks caution argument where purported cautionary language did not sufficiently counter alleged misstatements and omissions); see also Fecht v. The Price Company, 70 F.3d 1078, 1082 (9th Cir. 1995) ("Inclusion of some cautionary language is not enough to support a determination as a matter of law that defendants' statements were not misleading.") (emphasis in original) (citation omitted), cert. denied, 116 S. Ct. 1422 (1996);

Rubinstein v. Collins, 20 F.3d 160, 171 (5th Cir. 1994) (reiterating view that "`[t]o warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit'") (footnote omitted). In short, we cannot conclude that the alleged misrepresentations would have been "so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality." UJB, 964 F.2d at 281 n.11 (citation omitted). Dismissal of the loan loss reserves claims for the period after February 27, 1991 was thus improper, and we reverse this aspect of the orders entered in Westinghouse I and Westinghouse II.

IV.

Plaintiffs next challenge the district court's dismissal of various other portions of their section 10(b) claims. To state a securities fraud claim under section 10(b) and rule 10b-5, a private plaintiff must plead the following elements: (1) that the defendant made a misrepresentation or omission of (2) a material (3) fact; (4) that the defendant acted with knowledge or recklessness and (5) that the plaintiff reasonably relied on the misrepresentation or omission and (6) consequently suffered damage. E.g., UJB, 964 F.2d at 280. Also, because section 10(b) claims sound in fraud, the circumstances constituting the fraud must be stated with particularity. See id. at 284; In re Craftmatic Securities Litigation, 890 F.2d 628, 645 (3d Cir. 1989); Fed. R. Civ. P. 9(b). "Rule 9(b) requires a plaintiff to plead (1) a specific false representation of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his damage." UJB, 964 F.2d at 284 (citing Christidis v. First Pennsylvania Mortgage Trust, 717 F.2d 96, 99 (3d Cir. 1983)).

Plaintiffs argue first that the district court improperly dismissed the section 10(b) claims against the Westinghouse defendants relating to Westinghouse's alleged concealment of nonearning receivables and inadequate internal controls. Plaintiffs further contend that the district court erred in dismissing the section 10(b) claim against Price Waterhouse. Plaintiffs also challenge the district court's dismissal of their claim that one of the underwriter defendants intentionally misled the public in the May 1991 offering. We will consider each of plaintiffs' arguments.

A. Nonearning receivables, also known as nonaccrual loans or nonearning loans, are defined as "[l]oans on which accrual of interest has been suspended because collectibility is doubtful." American Institute of Certified Public Accountants ("AICPA"), Audits of Finance Companies 108 (1994); see also American Bankers Association, Banking Terminology 244 (3d ed. 1989) (defining nonearning asset as "[a]n asset that does not produce income, such as . . . required reserves, or a nonaccrual loan"). Plaintiffs allege that Westinghouse manipulated its nonearning receivables accounts to overstate the quality of its

receivables portfolio.

The district court essentially found that plaintiffs had not pled facts explaining with particularity how Westinghouse's statements concerning nonearning receivables were false and misleading or violated GAAP. The district court thus dismissed these allegations under Rules 12(b)(6) and 9(b) as "conclusory rather than factual." 832 F. Supp. at 967-68; seealso Westinghouse II, Op. at 4-6, App. 313-15. The court found that plaintiffs, with the benefit of hindsight, were merely challenging Westinghouse's judgment as to when collectibility on the loans became doubtful. Id. We disagree.

Plaintiffs allege that the Westinghouse defendants arbitrarily moved loans from nonearning to earning status just before mandated public reporting when, in fact, nothing had changed regarding the likelihood of collection. Plaintiffs contend that they have pled specific facts permitting the inference that defendants were intentionally concealing loan losses. We agree. Plaintiffs are not merely challenging defendants' judgment regarding when collectibility became doubtful; instead, plaintiffs allege that defendants changed the classification of the loans when nothing regarding collectibility had occurred. Plaintiffs allege that specific loans had at least three of the eight AICPA earmarks for nonearning status both before and after they were removed from nonearning status. On a motion for summary judgment, defendants may be able to show why the status of these loans consistently changed just prior to the time of reporting, and they may be able to establish that no reasonable factfinder could find for plaintiffs. At this stage, however, we cannot say that plaintiffs have failed to state a claim or have failed to plead fraud with sufficient particularity. We therefore reverse this aspect of the district court's orders.

B. Plaintiffs also allege that Westinghouse fraudulently overstated the quality of its internal controls, in violation of section 10(b). Westinghouse indisputably made representations throughout the class period regarding the adequacy of its internal controls. Plaintiffs essentially contend that those statements were made without a reasonable basis and with knowledge of or in reckless disregard of facts suggesting their falsity.

Plaintiffs' claim is based primarily on an internal report prepared following an anonymous tip alleging inadequate internal accounting controls. After rejecting the assertions of the anonymous tip, the November 1990 report discussed recommendations for improving internal controls and addressing some overall concerns that the auditors had identified. See App. 939-53.

The district court found that "[t]he fact that the internal auditors also recommended improvements in valuation methods and tighter standards for internal valuations does not support plaintiffs' claim that in its Form 10K's Westinghouse fraudulently or even inaccurately represented its internal controls as adequate." 832 F. Supp. at 979; see alsoWestinghouse II, at 8-9 ("plaintiffs' assertions amount to

nothing more than `fraud by hindsight' allegations, based on the premise that the internal controls turned out to be inadequate."). We agree that plaintiffs have failed to plead any facts supporting their conclusory allegation that Westinghouse fraudulently misrepresented the adequacy of its internal controls. We therefore affirm dismissal of this aspect of the section 10(b) claim.

C. Plaintiffs argue that the district court, by "compartmentalizing the evidence and wiping the slate clean after considering each component," failed to give weight to the "totality of the pleadings." Plfs' Br. at 25. We have instructed that the district courts should engage in precisely the sort of analysis undertaken by the district court in this case, see, e.g., UJB, 964 F.2d at 284; Craftmatic, 890 F.2d at 640, and we therefore find no merit in this argument.

In addition, plaintiffs' discussion of Rule 9(b) suggests that the district court improperly required them to plead defendants' state of mind with particularity. See Plfs' Br. at 18-20 (relying on In re Glenfed, Inc. Securities Litigation, 42 F.3d 1541 (9th Cir. 1994) (en banc)). We do not see any evidence of such a requirement in the district court's opinions, and we therefore find plaintiffs' legal argument irrelevant.

D. Plaintiffs also appeal from dismissal of certain aspects of their section 10(b) claim against Price Waterhouse arising out of Price Waterhouse's 1988 and 1989 audits. The district court granted Price Waterhouse's motion to dismiss in Westinghouse II based on plaintiffs' failure to plead any facts suggesting fraud on the part of Price Waterhouse with respect to the 1988 and 1989 audits. Westinghouse II, at 21-30, App. 330-39. The district court concluded that plaintiffs failed to state a fraud claim both with respect to whether Price Waterhouse fraudulently violated Generally Accepted Accounting Standards ("GAAS") in its 1988 and 1989 audits and with respect to whether Price Waterhouse knew that Westinghouse's 1988 and 1989 financial statements failed to comply with GAAP and fraudulently stated otherwise. The district court found that the only factual allegations contained in the second amended complaint relevant to plaintiffs' section 10(b) claims against Price Waterhouse related to the 1990 audit.

Although plaintiffs cite various GAAS standards, they nowhere explain how Price Waterhouse knowingly or recklessly violated those standards in performing its 1988 and 1989 audits. For example, plaintiffs' complaint fails to allege any facts supporting their conclusory allegation that Price Waterhouse failed to follow GAAS in determining whether Westinghouse's 2.5% loss reserves were reasonable in 1988 and 1989. Moreover, as Price Waterhouse properly argues, plaintiffs do not allege that Price Waterhouse failed to consider the adequacy of Westinghouse's internal controls in planning the scope of or in executing the 1988 and 1989 audits; nor do plaintiffs allege that Price Waterhouse opined on the adequacy of Westinghouse's internal controls in those audits.

Plaintiffs' GAAP arguments are similarly unavailing.

Under Christidis, plaintiffs must allege facts that give rise to an inference that Price Waterhouse knew or was reckless in not knowing that Westinghouse's financial statements failed to comply with GAAP.  717 F.2d at 100; see also Eisenberg v. Gagnon, 766 F.2d 770, 776-78 (3d Cir.), cert. denied, 474 U.S. 946 (1985). There are no facts cited in plaintiffs' second amended complaint supporting an inference that Price Waterhouse knew or was reckless in not knowing that Westinghouse was using speculative, inflated values in valuing receivables.  Moreover, although Price Waterhouse concedes that it knew that Westinghouse set its loss reserves at 2.5% of total assets in audit years 1988 and 1989, this fact provides no support for plaintiffs' allegation that Price Waterhouse knew that Westinghouse was violating GAAP in those years.  Assuming that Westinghouse violated GAAP during 1988 and 1989, plaintiffs nonetheless fail to allege facts suggesting that Price Waterhouse intentionally or recklessly misrepresented Westinghouse's compliance with GAAP.

In short, plaintiffs fail to allege any facts supporting an inference that Price Waterhouse made fraudulent misrepresentations in its 1988 and 1989 audit opinions. Plaintiffs' allegations do not support an inference that Price Waterhouse could not reasonably and in good faith have opined that the financial statements as a whole fairly presented the financial condition of Westinghouse in accordance with GAAP.  We therefore affirm the district court's order dismissing the section 10(b) claims against Price Waterhouse arising out of Price Waterhouse's 1988 and 1989 audits.

E.  Plaintiffs also challenge the district court's dismissal of their section 10(b) claims against Lazard Freres ("Lazard"), one of the underwriter defendants.  In addition to dismissing these claims under the "bespeaks caution" doctrine, the district court dismissed them on the ground that plaintiffs failed to plead any facts supporting section 10(b) liability against Lazard.  See Westinghouse I, 832 F. Supp. at 979-81; Westinghouse II, at 33-34, App. 342-43.  In Westinghouse I, the district court found that the documents upon which plaintiffs relied could not bear the construction placed on them by plaintiffs.  832 F. Supp. at 979-81; see also Westinghouse II, at 33, App. 342.  We agree.

Plaintiffs place primary reliance on Lazard's December 2, 1990, Progress Report and on a document entitled "Westinghouse Electric -- Board Meeting Q & A," developed for use at the February 27, 1991, Board meeting.  See App. 1428-41 (Progress Report); App. 1134-36 (Q & A).  Plaintiffs also rely on a report prepared by Westinghouse in September 1990.  See App. 918-36.

In the Progress Report, Lazard recommended "serious consideration of a comprehensive restructuring program which could include a one-time charge to earnings." App. 1435.  Lazard also explained that "[t]he possible restructuring outlined earlier implies the ultimate disposition of roughly $3.2 billion or 55% of non-real estate assets and at least $1.5 billion of real estate (problem real estate totalled $1.5 billion or 37% of the portfolio at September 30, 1990)." App. 1440 (emphasis in original).  In the proposed question and answer script, Lazard

suggested the following response to the question, "Are the reserves adequate?": "Given the results of each of these review processes, the charge taken today is clearly reasonable but was at the low end of the range identified by management in conjunction with the strategic review performed by Lazard." App. 1135.

Based on the above sources, plaintiffs argue that Lazard knew that the February 1991 charge was inadequate to protect against known and likely losses. We agree with the district court, however, that the documents on which plaintiffs rely simply do not support their conclusory allegations and that plaintiffs fail to allege facts supporting their section 10(b) claims against Lazard. These claims were properly dismissed in Westinghouse I and Westinghouse II.

V.

Defendants argued in the district court that plaintiffs' allegations regarding loan loss reserves and non-earning loans in count I were subject to dismissal as being quantitatively immaterial as a matter of law (separate and apart from the "bespeaks caution" doctrine). In Westinghouse I, the district court rejected defendants' argument, finding that the allegations of wrongfully understated reserves were sufficiently substantial when compared to Westinghouse's net income for the relevant time periods. 832 F. Supp. at 971-73. In Westinghouse II, defendants argued that plaintiffs failed to allege a material misrepresentation or omission during the time period of March 28, 1989, through March 28, 1990 (i.e., the first year of the class period) with respect to their allegations regarding the loan loss reserves and nonearning loans. Westinghouse II, Op. at 13-18, App. 322-27. The district court agreed and dismissed these claims for the first year of the class period. Id.

Plaintiffs challenge this aspect of Westinghouse II, Plfs' Br. at 34-38, and defendants counter that all of the allegations regarding nonearning assets and loan loss reserves (not merely those for the first year of the class period) could and should have been dismissed on quantitative materiality grounds. West. Br. at 39-45. Assuming without deciding that defendants' latter argument (which was not raised on defendants' motion to dismiss the second amended complaint) is properly before us, we find it to be without merit. We thus turn to the dismissal of plaintiffs' claims for the first year of the class period.

As referred to earlier in our discussion of the "bespeaks caution" doctrine, "[a]n omitted fact is material if there is a `substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder.'" UJB, 964 F.2d at 281 n.11 (quoting T.S.C. Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)). "In other words, the issue is whether there is a substantial likelihood that the disclosure would have been viewed by the reasonable investor as having `significantly altered the "total mix" of information' available to that investor." Id. Moreover,

"[m]ateriality is a mixed question of law and fact, and the delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts are peculiarly for the trier of fact."  Id. (citing T.S.C., 426 U.S. at 450).  Therefore, "[o]nly if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law."  Id.

The district court recognized that the adequacy of loan loss reserves is generally the type of information that would significantly influence a reasonable investor.  Westinghouse I, 832 F. Supp. at 972 (citing UJB, 964 F.2d at 281).  However, the court also tested plaintiffs' complaint to determine whether the allegations regarding loan loss reserves were quantitatively material in this particular case.  The district court stated that "[t]he failure to disclose that a loan portfolio is likely to be impaired by some de minimis amount may be `relevant' in that it is the type of information that investors care about, but of such `dubious significance' as to be `trivial,' and `hardly conducive to informed decisionmaking,' so that to reasonable shareholders, such omission must be immaterial as a matter of law."  Id. at 972 (quoting TSC Industries, 426 U.S. at 448–49).  We agree.  Seegenerally Loss & Seligman, Fundamentals of Securities Regulation137–41, 479–80 (1995) (quantitative materiality analysis is generally appropriate, though not when "such matters as a conflict of interest or criminal violations are at issue"); seealso Ferber v. Travelers Corp., 802 F. Supp. 698, 708 (D. Conn. 1992) (omission of extent of second mortgages not material in relation to overall real estate, investment, and asset portfolios); In re First Chicago Corp. Securities Litigation, 769 F. Supp. 1444, 1454 (N.D. Ill. 1991) (total value of alleged bad loan immaterial in relation to size of defendant's real estate loan portfolio).

Plaintiffs do not dispute that their only allegation challenging the adequacy of loan loss reserves prior to the fourth quarter of 1989 has to do with one asset that allegedly was improperly not written down by $1.278 million during the third quarter of that year.  See App. 1234.  The charge that would have followed the write–down of this asset would have amounted to merely 0.54% of Westinghouse's net income of $234 million for that quarter.  We agree with the district court that this allegation is not sufficiently material to be actionable, i.e., there is not a substantial likelihood that this information would have assumed actual significance in the deliberations of a reasonable investor.  Plaintiffs thus allege no actionable reserves claims for the period prior to the fourth quarter of 1989.  The first actionable disclosures alleged in the second amended complaint relating to loan loss reserves for the fourth quarter of 1989 occurred on March 29, 1990.  The district court thus properly dismissed the reserves allegations that concern the period prior to the March 29, 1990, disclosures.

The district court also dismissed the nonearning loans allegations relating to the first year of the class period.  The

court found that the assets identified in plaintiffs' complaint that allegedly should have been classified as nonearning through the fourth quarter of 1989 were barely 1% of Westinghouse's current assets for any quarter during that period and were thus immaterial.  The second amended complaint alleges that prior to the fourth quarter of 1989, eight assets were improperly not classified as nonearning assets.  See App. 1169-76.  These accounts amount to just 0.51% of Westinghouse's current assets for the first and second quarters of 1989 and only 1.2% of Westinghouse's current assets for the third quarter of 1989.  We again agree with the district court that these allegations are not sufficiently substantial to be material, and plaintiffs therefore allege no actionable nonearning loans claims for the period prior to the fourth quarter of 1989.  As with the reserves claims, the first actionable disclosures alleged in the second amended complaint relating to nonearning loans for the fourth quarter of 1989 occurred on March 29, 1990.  The district court thus properly dismissed the nonearning loans allegations that relate to the period prior to the March 29, 1990, disclosures.

VI.

A.  As discussed above, the district court dismissed the section 12(2) claims under the "bespeaks caution" doctrine.  The district court also dismissed the section 12(2) claims on the ground that plaintiffs failed to allege that defendants "offered or sold" Westinghouse securities to plaintiffs within the meaning of section 12(2).  We turn now to plaintiffs' challenge to this determination.

Section 12(2) provides that a person who "offers or sells" newly issued securities by means of a prospectus or oral communication that misrepresents or omits material facts is liable to the person "purchasing such security from him."  15 U.S.C.  77l(2).  In Pinter v. Dahl, 486 U.S. 622 (1988), the Supreme Court stated that although the language of section 12(1) "contemplates a buyer-seller relationship not unlike traditional contract privity," id. at 642, its scope is not limited only to those who pass title.  Id. at 642-47.  The Court held that the term "seller" in the context of section 12(1) includes (1) "the owner who passed title, or other interest in the security, to the buyer for value" and (2) "the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner."  Id. at 642, 647.  Under Pinter, both direct sellers and those who engage in the active solicitation of an offer to buy can be "sellers" for purposes of section 12(1).  See id. at 646-47.

In In re Craftmatic Securities Litigation, 890 F.2d 628 (3d Cir. 1989), we held that the Supreme Court's definition of the term "seller" under section 12(1) applies in actions brought under section 12(2).  Id. at 634-36; see also UJB, 964 F.2d at 286-87.  Thus, under Pinter and our cases, a section 12(2) seller may be one who passes title to the buyer for value (a direct seller) or one "who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests

or those of the securities owner" (a solicitor seller).  Pinter, 486 U.S. at 643.

In Craftmatic, we cautioned that "the language of  12, which makes a participant liable to the `person purchasing such a security from him . . .,' precludes actions against remote sellers, and focuses the inquiry on the relationship between the purchaser and the participant, rather than on the latter's degree of involvement in the transaction."  Craftmatic, 890 F.2d at 636 (citation omitted).  We added with regard to solicitation liability that "although an issuer is no longer immunized from 12 liability, neither is an issuer liable solely on the basis of its involvement in preparing the prospectus.  The purchaser must demonstrate direct and active participation in the solicitation of the immediate sale to hold the issuer liable as a  12(2) seller."  Id. (citations omitted).

B.  Plaintiffs do not claim that any of the Westinghouse defendants were direct sellers.  Rather, plaintiffs allege that the underwriter defendants purchased the shares from Westinghouse and resold them to the public, including plaintiffs.  E.g., App. 362-63, 366-67.  The Westinghouse defendants therefore cannot be liable under section 12(2) as direct sellers.  Cf. UJB, 962 F.2d at 287 (plaintiffs not required to allege direct and active solicitation where newly offered shares were purchased directly through defendant UJB).  Plaintiffs further allege as follows:

> 593.  The section 12 Defendants were sellers of Westinghouse securities within the meaning of Section 12(2) of the Securities Act and either sold or promoted the sale of said securities directly to plaintiffs and other Class members or solicited plaintiffs and other Class members to buy such securities.  In so acting, the Section 12 Defendants were motivated by a desire to serve their own financial interests.

App. 506 (count III); see also App. 511-12 (count V).  Plaintiffs allege no facts suggesting how any Westinghouse defendants directly and actively participated in the solicitation of plaintiffs' immediate purchases of Westinghouse stock.

The district court dismissed the section 12(2) claims, explaining as follows:

> [P]laintiffs have not alleged that the Westinghouse defendants in fact sold or solicited the purchase of Westinghouse securities, but attempt nonetheless to analogize their allegations to the allegations and holding in Craftmatic by pointing to the similarity of language employed. . . .  The conclusory allegation that defendants sold or solicited the purchase of securities will withstand a motion to dismiss only if accompanied by allegations of fact that defendants did sell or solicit the purchase of securities.

Westinghouse I, 832 F. Supp. at 984 (citation and footnote omitted) (emphasis in original). Plaintiffs argue that because the facts alleged in their complaint are so similar to the factual allegations of the complaint sustained in Craftmatic, they stated a section 12(2) claim. See Plfs' Br. at 40-41. We are constrained to agree.

It is certainly true that plaintiffs' section 12(2) allegations are not clearly drafted. Plaintiffs do not, for example, make clear which defendants are alleged to be direct sellers as opposed to solicitor sellers. See UJB, 964 F.2d at 287 n.17. Nor do plaintiffs allege how the Westinghouse defendants, assuming they are alleged to be solicitor sellers, directly and actively participated in the solicitation of the immediate sales. Further, plaintiffs' allegation that defendants "promoted the sale of" securities would not, standing alone, give rise to any section 12(2) liability. The district court could certainly require that plaintiffs clear up these ambiguities on remand.

Taken in the light most favorable to plaintiffs, however, the complaint does allege that the Westinghouse defendants "solicited plaintiffs" to purchase Westinghouse securities and that in so doing they were motivated by a desire to serve their own financial interests. Contrary to the district court's statement, these are factual allegations -- allegations plaintiffs will have to prove -- and not bare legal conclusions. Under Craftmatic, plaintiffs' allegations are sufficient to survive a motion to dismiss under Rule 12(b)(6): "It cannot be said at this juncture that plaintiffs can prove no set of facts that would entitle them to relief." Craftmatic, 890 F.2d at 637 (citations omitted). For these reasons, we reverse the district court's order dismissing the section 12(2) claims against the Westinghouse defendants.

We note that although fraud is not a necessary element of a claim under section 12(2), section 12(2) claims that do sound in fraud must be pled with particularity. UJB, 964 F.2d at 288-89. The district court did not decide, nor do defendants argue, that plaintiffs' section 12(2) claims sound in fraud. To the extent, if any, that the section 12(2) claims in fact sound in fraud, plaintiffs could justifiably be required to plead the circumstances constituting fraud with the particularity required by Rule 9(b). This is not, however, the theory on which the district court rested its decision; nor has it been advanced by the parties in this court.

C. As to the underwriter defendants, the first amended complaint alleges that "[e]ach member of the Underwriter Class sold Westinghouse stock to members of the Prospectus Subclass during the Class Period." App. 367. Plaintiffs further allege that the underwriter defendants sold Westinghouse securities "directly to plaintiffs and other Class members." App. 506.

The district court dismissed the section 12(2) claims against the underwriter defendants, finding that plaintiffs failed to allege that the underwriter defendants were statutory sellers under section 12(2). The district court explained as follows:

> In Count Three, plaintiffs must allege, to state a viable Section 12(2) cause of action, that the underwriter defendants were "sellers" within the meaning of Section 12(2). That is, there must be an allegation that a particular proposed defendant sold or solicited the sale of Westinghouse securities to the individual plaintiffs. Pinter v. Dahl, 486 U.S. at 643-47. This element is lacking.

Westinghouse I, 832 F. Supp. at 987.

We agree with the district court that plaintiffs must allege that the underwriter defendants were section 12(2) sellers, but we do not find support in Pinter for the district court's statement that, in order to achieve this, plaintiffs are required to allege which underwriter sold securities to each plaintiff. Under Pinter, a plaintiff will not succeed on a section 12(2) claim unless the plaintiff shows, among other things, that the plaintiff bought from or was solicited by a specified statutory seller. But Pinter does not address what allegations are necessary to plead that a defendant is a seller within the meaning of the statute. Absent a particularity requirement, plaintiffs must provide a short and plain statement showing that the underwriter defendants are statutory sellers and that plaintiffs purchased securities from them.

We find that plaintiffs satisfied this requirement and stated a section 12(2) claim against the underwriter defendants. Taken in the light most favorable to plaintiffs, the first amended complaint alleges that each of the underwriter defendants sold Westinghouse securities directly to plaintiffs and that each plaintiff purchased Westinghouse securities directly from an underwriter defendant. Cf. Jackson v. First Federal Savings of Arkansas, 709 F. Supp. 863, 884 (E.D. Ark. 1988) (dismissing section 12(2) claim where plaintiff did not allege that any defendant sold him his shares or solicited him to buy his shares). The defendants and the district court have not pointed to any authority requiring anything further. Although plaintiffs did not submit a model pleading, we cannot say they failed to state a claim under Rule 12(b)(6). Compare Craftmatic, 890 F.2d at 637; see also Moore v. Kayport Package Express, Inc., 885 F.2d 531, 538-39 (9th Cir. 1989) ("While this is not a model form of pleading a section 12(2) claim, it satisfies the short and plain statement rule of Rule 8(a)(2) which provides that a pleading which sets forth a claim for relief shall contain `a short and plain statement of the claim showing that the pleader is entitled to relief.'") (citation omitted); In re Chambers Development Securities Litigation, 848 F. Supp. 602, 625 (W.D. Pa. 1994) (sustaining section 12(2) allegations not unlike those in this case); Miller v. New America High Income Fund, 755 F. Supp. 1099, 1105 (D. Mass. 1991) ("Applying the appropriate standard of scrutiny for a Rule 12(b)(6) motion, a set of facts establishing the underwriter defendants as `sellers' is clearly plausible, although the plaintiffs must later produce facts to prove the underwriter defendants' actual participation in the

activity.") (citation omitted), aff'd, 36 F.3d 170 (1st Cir. 1994). We therefore reverse the district court's order dismissing the section 12(2) claims against the underwriter defendants.

## VII.

After defendants filed the motions to dismiss that led to Westinghouse II, plaintiffs cross-moved to supplement the second amended complaint. See App. 1582-83. Plaintiffs sought to add an additional alleged misrepresentation -- Lego's alleged October 1990 statement that Westinghouse had only an immaterial amount of restructured receivables.

Plaintiffs' motion is not discussed at any length in Westinghouse II. It is addressed in one sentence of the opinion and one sentence of the order. See Westinghouse II, Op. at 21, App. 330 (dismissing second amended complaint under rule 8; granting plaintiffs 30 days within which to replead surviving claims in compliance with rule 8; and denying as moot the cross-motion to supplement); Westinghouse II, Order at 35, App. 344 ("Plaintiffs' cross-motion to supplement the Second Amended Complaint (Docket No. 174) is denied as moot."). In their brief on appeal, plaintiffs state that "[t]he only possible basis for the finding of mootness was the blanket dismissal of the Second Complaint under Rule 8." Plaintiffs' Br. at 47. It seems to us that this is in fact why the district judge dismissed the motion as moot -- because plaintiffs were presumably going to be submitting a third amended complaint and would include the newly-discovered allegation in that complaint.

We find no abuse of discretion in this ruling. The plaintiffs could have included (and were expected to include) the allegation at issue in the third amended complaint. They chose not to submit that complaint. The allegation at issue is relevant to claims that survived the district court's orders in Westinghouse I and Westinghouse II, claims that were dismissed with prejudice under Rule 8 only after plaintiffs' decision to stand on the second amended complaint. Plaintiffs therefore abandoned this allegation when they chose not to submit a third amended complaint.

## VIII.

Plaintiffs argue that on remand this case should be reassigned to a new district court judge. Plaintiffs rely primarily upon the following statement from Westinghouse I:

> In the early 1980's, WCC hit its stride when it tapped into the booming commercial and residential real estate markets.
>
> Such success, however, was short-lived. WCC's fortunes collapsed along with the real estate market in the late-1980's, and the price of Westinghouse stock tumbled during the class period from a high of $39.75/share to a low of $15.875/share. Now, like so many lending institutions battered by the late-

1980's real estate bust, Westinghouse, along with its outside accountant and investment bankers, is defending against shareholders who allege that the company made false and misleading statements regarding the health of its financial services units, thereby artificially inflating the price of Westinghouse stock and damaging plaintiffs who purchased that stock at what they claim to have been an artificially high price.

Westinghouse I, 832 F. Supp. at 958 (citations omitted).

According to plaintiffs, "[t]his statement suggests that plaintiffs' claims have no merit and that their damages were caused not by defendants' fraud, but by an economic environment visited on defendants." Plfs' Br. at 48. Plaintiffs argue that although it was proper for the judge to take judicial notice of the downturn in the real estate market, "it was improper for [the judge] to attribute plaintiffs' extensive damages to this trend rather than to defendants' fraudulent scheme as alleged in the Complaints." Plfs' Rep. Br. at 24. Plaintiffs seem to us to read too much into the judge's statement, and we note that the district judge's comment was not unlike others found in other reported decisions. See, e.g., UJB, 964 F.2d at 274 ("This case is one of a number of federal securities actions against financially troubled banking institutions. After a sharp downturn in the financial condition of defendant UJB Financial Corporation, its shareholders filed a complaint[.]"); see alsoSerabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357, 360 (1st Cir. 1994) ("The complaint depicts an increasingly familiar saga of a bank that boomed with the real estate market of the early 1980s, but suffered in the recession and deteriorating market that followed.") (citations omitted).

As in United States v. Bertoli, 40 F.3d 1384, 1412 (3d Cir. 1994), plaintiffs here make "no allegation that [the district judge] derived his bias from an extrajudicial source." Rather, all the incidents cited involve rulings and statements made in deciding motions. "Thus, these incidents will not support recusal unless, looked at objectively, `they display a deep-seated favoritism or antagonism that would make fair judgment impossible.'" Id. (quoting Liteky v. United States, 114 S. Ct. 1147, 1157 (1994)). Plaintiffs have not identified anything suggesting such a favoritism or antagonism, and our review of the record reveals none. Finally, we note that, as a practical matter, the judge sustained a number of the section 10(b) claims asserted in count I in both Westinghouse I and Westinghouse II. For these reasons, we reject all of plaintiffs' contentions raised in support of their reassignment argument. We wish to emphasize that requesting reassignment is a grave step; it should not be taken lightly or for the purpose of seeking some strategic advantage.

IX.

For the foregoing reasons, we affirm in part and reverse in part the district court's orders entered on July 29,

1993 (Westinghouse I), January 23, 1995 (Westinghouse II), and March 1, 1995 (Memorandum Order dated 2/28/95), and we remand for further proceedings consistent with this opinion.