In re CYBERSHOP.COM SECURITIES LITIGATION.

THIS DOCUMENT RELATES TO ALL ACTIONS.

Civ. No. 00–1993 (JAP).

United States District Court, D. New Jersey.

March 18, 2002.

Robert J. Berg, Bernstein Liebhard & Lifshitz, LLP, Fort Lee, NJ, Lead Counsel for Plaintiff and the Class.

Mel E. Lifshitz, Timothy J. MacFall, Bernstein Liebhard & Lifshitz, LLP New York City, Of Counsel to Lead Plaintiff and the Class.

Allyn Z. Lite, Joseph DePalma, Lite De-Palma Greenberg & Rivas, LLP Newark, NJ, Mark C. Gardy, Abbey & Gardy, LLP, New York City, Joseph H. Weiss, Weiss & Yourman, New York City, James V. Bashian, Law Offices of James V. Bashian, P.C., New York City, Cohen Milstein Hausfeld Toll, P.L.L.C., Washington, DC, Jules Brody, Stull Stull & Brody, New York City, Wallace A. Showman, Law Office of Wallace A. Showman, P.C., New York City, Andrew Barroway, Schiffrin & Barroway, LLP, Jeffrey C. Block, Berman, DeValerio & Pease, LLP, Boston, MA, Bernstein Litowitz Berger & Grossman, New York City, Milberg Weiss Bershad Hynes & Lerach, LLP, New York City, Levy & Levy, New York City, Plaintiff.

Irwin Warren, Miranda S. Schiller, Candice M. Toll, Weil, Gotshal & Manges, New York City, for Defendants Grove Street Ventures, Inc. (formerly Cybershop.com, Inc.), Jeffrey Tauber, and Jeffrey Leist.

Frederic K. Becker, Edward T. Kole, Wilentz Goldman & Spitzer, P.A., Woodbridge, NJ, for Defendants Grove Street Ventures, Inc. (formerly Cybershop.com, Inc.), Jeffrey Tauber, and Jeffrey Leist.

Katherine Glynn, Robinson & Cole, New York City, for Defendant Ian S. Phillips.

PISANO, District Judge.

Defendants Grove Street Ventures, Inc. ("GSV") (formerly Cybershop.com, Inc.), Jeffrey Tauber, Jeffrey Leist, and Ian Phillips are before the Court on their motion to dismiss the Plaintiff's consolidated amended class action complaint ("amended complaint") under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Defendants allege that Plaintiff has failed to plead sufficient facts to prove its alleged

violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). The class period relevant to these alleged violations extends from October 26, 1999 through February 24, 2000 (the "class period"). (Am. Compl. at ¶ 14). The Court heard oral argument on Defendants' motion on January 4, 2002, and has jurisdiction to consider this matter under 28 U.S.C. § 1331. For the reasons set forth below, Defendants' motion to dismiss the Plaintiff's amended complaint is granted.

## I. Facts

For the limited purpose of this motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court, as it must, accepts as true the facts alleged in the amended complaint and all reasonable inferences drawn from those facts. *See Hayes v. Gross*, 982 F.2d 104, 106 (3d Cir.1992); *see also* infra IV. Rule 12(b)(6) Standard. Accordingly, the facts recited below are taken from Plaintiff's amended complaint, and do not reflect this Court's factual findings.

### A. The Parties

Lead Plaintiff FU Investment Company and all other class members purchased common stock in Cybershop sometime between October 26, 1999 and February 24, 2000. (Am. Compl. at ¶¶ 7, 14–20.) Cybershop, then a Delaware corporation operating a principal place of business in Jersey City, New Jersey, was an online and direct-to-consumer retailer throughout the relevant class period. (Am. Compl. at ¶¶ 8, 24.) Cybershop's "store," which was located online at **www.cybershop.com** sold discounted, designer and brand-name apparel, electronics, home accessories, toys, gifts and watches at closeout prices. (Am. Compl. at ¶¶ 8, 24.) Through a joint ven-ture with Tops Appliance City ("Tops"), Cybershop also sold online at www.electronics.net various consumer electronics, appliances, and home office equipment. (Am. Compl. at ¶¶ 8, 24.)

Defendants Jeffrey S. Tauber, Ian S. Phillips, and Jeffrey Leist (collectively referred to as the "Individual Defendants"), were officers and/or directors of Cybershop during the class period. Tauber, at all relevant times, was the Chairman, Chief Executive Officer, President, Principal Executive Officer, and a director of Cybershop. (Am. Compl. at ¶ 9.) In these capacities, he was responsible for signing quarterly reports on Form 10–Q with the Securities and Exchange Commission (the "SEC"), and for issuing statements on Cybershop's behalf. (Am. Compl. at ¶ 9.) Phillips was a director of Cybershop and the Chief Executive Officer of MG Acquisition Corp., a wholly-owned subsidiary of Cybershop. (Am. Compl. at ¶ 10.) Leist was the Senior Vice President and Chief Operating Officer as of February 1999, and also was the Chief Financial Officer from April 1999 until April 2000, when he resigned. (Am. Compl. at ¶ 11.)

### B. Procedural History

Initially, approximately thirteen parties filed separate complaints alleging that Cybershop and the Individual Defendants violated securities regulation laws. (T3 at 12–15.[1]) After a conference with the parties on April 15, 2000, the Court entered an order consolidating all cases. The Court also selected FU Investment Co. as lead Plaintiff ("Plaintiff"), appointed Bernstein Liebhard & Liftshitz LLP as lead counsel, and directed Plaintiff to file a consolidated amended class action complaint. Plaintiff so filed, and that pleading is the one that this Court reviews in con-

---

**1.** "T" refers to the Transcript of Proceedings taken on January 4, 2002.

sidering the motion now before it. Plaintiff opposes that motion, and contends alternatively that it should be granted leave to amend under Rule 15 of the Federal Rules of Civil Procedure so that it may cure any deficiencies within the amended complaint. (Pl.'s Opposing Mem. at 39 n. 21.)

## II. Class Allegations

The allegations in the amended complaint are based primarily "on the investigation by Plaintiff's attorneys." (Am. Compl. at ¶ 1.) That investigation included a review of: SEC filings[2], reports and advisories, Cybershop's press releases and other public statements, and media reports. (Am. Compl. at ¶ 1.) The amended complaint alleges that Cybershop and the Individual Defendants caused Plaintiff to purchase Cybershop's common stock at "artificially inflated prices" during the class period. (Am. Compl. at ¶ 7.) It further alleges that the Individual Defendants violated section 20(a) of the Exchange Act by breaching their duty to correct Cybershop's false and misleading public statements. (Am. Compl. at ¶ 13.) The amended complaint also asserts that Cybershop made material misrepresentations to the public or failed to disclose to the public facts that "would tend to induce a reasonable investor to misjudge the value of Cybershop's common stock." (Am. Compl. at ¶ 22.) Additionally, Plaintiff claims that various analysts wrote and released public reports regarding Cybershop to the sales force, to brokerage firm customers, and to various automated data retrieval services. (Am. Compl. at ¶ 22).

## III. General Background

Effective June 1, 1999, Cybershop tendered one million shares of Cybershop's common stock and five thousand dollars to acquire all of the outstanding common stock of The Magellan Group, Inc. ("Magellan"), an online and direct response retailer of high quality personal care, home- and health-related products. (Am. Compl. at ¶ 26.) Cybershop began operating its Tools for Living division, formerly the Magellan business, during the second quarter of 1999. (Am. Compl. at ¶ 26.) That division offered high quality merchandise in the personal care, health, and home accessories categories, and promoted its merchandise through direct response, print media campaigns in national consumer magazines and at its website, **www.toolsforliving.com.** (Am. Compl. at ¶ 26.)

Cybershop's quarterly report dated August 13, 1999, which was filed with the SEC on Form 10–Q, identifies the company as "an online and direct[-]to[-]consumer retailer" with two online sites, **www.cybershop.com** and **www.electronics.net.** (Am. Compl. at ¶ 24.) In that 10–Q filing, Cybershop reported "a shift" in its commercial strategy:

> Beginning in the first quarter of the current year, the Company began implementing several operating initiatives at its flagship store, cybershop.com, designed to better serve its customers and streamline its operations. The Company has completed a shift in its merchandising strategy to focus on offering off-price branded merchandise such as that found in outlets and traditional discount retailers. The Company initiated a significant overhaul of its infrastructure,

---

**2.** The company made its SEC filings while it was trading as Cybershop.com, Inc. Before it made the filings at issue here, the company was known as Cybershop International Inc. (Am. Compl. at ¶ 1.) Today, Cybershop is known as GSV, Inc. (Am. Compl. at ¶ 1.) For purposes of clarity in this opinion, the Court refers to the Defendant company as simply "Cybershop."

migrating its web-based order processing onto a new platform, redesigning the web site and integrating it with a new order fulfillment system. The transition to an inventory-based model was completed in the second quarter with the development of a new distribution and fulfillment center. In addition, the Company launched two new online auction sites. With this initiative, the Company introduced the excitement of the online auction experience to all its customers, complementing its existing product offerings. The initiative also offers the Company a new way to attract customers, learn more about their shopping preferences and provide an effective mechanism to manage excess inventory. (Am. Compl. at ¶ 25.)

During the third and fourth quarters of 1999, Cybershop made public announcements that allegedly "were intended to, and did, convey, the impression that Cybershop was successfully positioning itself as the premier online name-brand discount retailer." (Am. Compl. at ¶ 27.) First, on September 16, 1999, Cybershop announced that it had signed exclusive, online distribution agreements with "key designer apparel brands": "Cybershop.com is leveraging its experience as traditional merchants and its position as a pioneer in e-commerce, to purchase close-outs and over stocks directly from America's most prestigious manufacturers." (Am. Compl. at ¶ 28.) Commenting on those agreements, Tauber stated that "[j]ust as T.J. Maxx and Marshalls ... have become the dominant brick and mortar retailer *[sic]* for off-price brands, we are positioning Cybershop.com as the key internet destination to purchase designer apparel and home furnishings." (Am. Compl. at ¶ 28.)

Next, on September 21, 1999, Cybershop announced that it had secured for its auction site additional distribution from Lycos, Excite@Home, and MSN: "[a]uctions have been an exciting feature, attracting thousands of new customers and registrants to CyberShop.com and electronics.Net who register to bid and win top quality, branded consumer electronics." (Am. Compl. at ¶ 30.) To this, Tauber added that "[a]uctions have been an exciting way for us to acquire new customers for both CyberShop.com and electronics.Net ... This new distribution from Lycos, MSN and Excite has given a real boost to our traffic and demand for auctions." (Am. Compl. at ¶ 31.)

On September 23, 1999, Cybershop announced that it had entered into an agreement with LookSmart to be featured in RewardMall, LookSmart's online shopping mall. Commenting on that new agreement, Tauber stated:

> Securing this key area will help to position us as the premier place to shop for branded discount merchandise and our broad selection of consumer electronics.... We believe our positioning with LookSmart in their RewardMall combined with their significant growth in traffic will be an important contributor to our traffic growth into the fourth quarter.

(Am. Compl. at ¶ 32.)

On September 30, 1999, Cybershop completed an equity securities private placement raising $5.1 million in gross proceeds. (Am. Compl. at ¶ 33.) Relevant to that placement, Cybershop issued a class of warrants that gave the investors the right to receive additional shares if the price of the stock trades fell below certain, specified levels. (Am. Compl. at ¶ 33.)

On October 4, 1999, Cybershop announced that Tops, its partner in the electronics.Net joint venture, had decided to discontinue consumer electronics sales so as to focus on higher-margin appliances sales. (Am. Compl. at ¶ 34.) Though elec-

tronics.Net would have access to Tops' inventory through the year, Cybershop had then started to seek alternative supply arrangements, indicating that "it is not believed that this decision by Tops will have a detrimental impact on the operating results of CyberShop.com." (Am. Compl. at ¶ 34.)

On October 21, 1999, Cybershop announced that it had signed an expanded agreement with Yahoo! to include its products in the Yahoo! shopping directory, (Am. Compl. at ¶ 35.):

> CyberShop.com is quickly establishing itself as one of the leading sites for designer apparel and other brand name merchandise at deep discount prices. With this deal, CyberShop.com will be well positioned to capitalize on the upcoming holiday season, which according to Jupiter Communications, an internet research firm, is estimated to generate $6 billion in online sales.

(Am. Compl. at ¶ 35.) Focusing on how this agreement would impact its continuous strategy, Tauber remarked:

> CyberShop.com has been growing rapidly with our last quarter revenues increasing over 270% over the June quarter ended 1998. This agreement with Yahoo! will further enable us to continue driving top line growth and bringing our deep merchandise mix to millions of additional online shoppers. . . . This deal highlights our ongoing strategy to become the premier destination on the Web for brand name merchandise while providing a fast and convenient shopping experience.

(Am. Compl. at ¶ 36.)

On the first day of the class period, October 26, 1999, Cybershop issued a press release entitled, "CyberShop.com(R) Third Quarter Net Sales Increase Over 450% from the Prior Year with Strong Product Gross Margins of 34%." The opening lines of that press release report:

> CyberShop.com(R), Inc. (NASDAQ: CYSP), a leading online retailer (http://www.cybershop.com) of brand name merchandise, announced today that its net sales of $2,788,000 for the third quarter of 1999, were up 458% from $500,000 in the third quarter of 1998 and up 35% from $2,067,000 in the second quarter of 1999. Gross margins for the quarter improved to 34% of net sales from 30% in the second quarter of 1999.

(Am. Compl. at ¶ 37.) Relevant to the Company's Tools for Living division, that press release informs:

> In June 1999, CyberShop.com acquired tools-for-living.com, a direct to consumer marketer of high quality merchandise in personal care, health and home accessories. These products are promoted on the http://tools.cybershop.com site and through print media campaigns in national consumer magazines.

(Aff. of Miranda Schiller ("Schiller Aff."), Ex. 25.) It does not specify Tools for Living's financial statistics or its impact on the company's revenues.

That press release quotes Tauber on the company's holiday sales preparations: "We are now gearing up for the upcoming holiday season with a host of online and off line initiatives to promote a number of hot products." (Am. Compl. at ¶ 37.) Cybershop also reported on its inventory and its service capabilities for that season: "In preparation for the holiday season, CyberShop.com is carrying thousands of products and over 150 top brands, and has boosted its fulfillment and customer service capacity to process many more orders in preparation for the fourth quarter." (Am. Compl. at ¶ 37.)

On November 5, 1999, Cybershop issued a press release summarizing an interview

that Tauber gave to The Wall Street Reporter. During that interview, Tauber described Cybershop as a retailer "providing consumers a better way to buy name brand apparel at deep discounts." "The new business model has been in place for a little more than two quarters with great success. In the second quarter we did roughly $2 million with a 30% gross margin, which is four times last year, and in our third quarter we did $3 million with a 34% gross margin." (Am. Compl. at ¶ 45.) Also during that interview, Tauber commented that "[w]e made a very important acquisition in June with Tools for living.com and we will continue to look for more acquisitions." (Am. Compl. at ¶ 45.) Tauber specifically noted some of the products offered through that division:

> the fourth quarter can represent over 50% of our business .... Right now we are expecting an enormous fourth quarter and its very exciting. We are not only leveraging our expertise picking *toys*, we will run Pokemon and Sega Dreamcast, we also have some great apparel items and a china pattern from Spode. We are ready.

(Am. Compl. at ¶ 45.)

Within approximately two weeks after the October 26, 1999 press release and within five days after the press release recounting Tauber's Wall Street Reporter interview, on November 11, 1999, Tauber and his wife sold 200,000 shares of Cybershop common stock at $10 per share, earning proceeds of $2 million. (Am. Compl. at ¶ 75.) Fifteen days later, on November 26, 1999, Tauber and his wife sold an additional 475,000 shares of Cybershop common stock, or 26% of their aggregate holdings. (Am. Compl. at ¶ 75.) Likewise, between November 22, 1999 and November 29, 1999, Phillips sold 40,000 shares of Cybershop common stock at prices ranging from $10.50 to $14 per share, earning $480,000.

(Am. Compl. at ¶ 75.) Additionally, Linda Wiatrowski, Cybershop's General Merchandise Manager and Vice President, sold 20,000 shares of the Company's stock on November 29, 1999, at $13.47 per share, earning proceeds of more than $269,000. (Am. Compl. at ¶ 75.) Neither Phillips nor Wiatrowski had previously sold any of their shares. (Am. Compl. at ¶ 75.) Plaintiff does not allege that Leist sold any stock.

Meanwhile, Cybershop issued a number of press releases announcing developments in its core operations:

- an extension in its relationship with AOL (Am. Compl. at ¶ 42.)
- implementation of the Business Evolution's @Once Service Center to enhance its customer service capabilities (Am. Compl. at ¶ 44.)
- an agreement with Merrill Lynch to feature Cybershop's online stores on Merrill Lynch's eShopping channel (Am. Compl. at ¶ 48.)
- it had been "aggressively building" marketing relationships with key shopping channels including AOL, Yahoo! Shopping, Microsoft's eShop and Inktomi in preparation the 1999 holiday selling season (Am. Compl. at ¶ 48.)
- an agreement with Women.com, under which its merchandise would be prominently featured under the fashion, beauty, and electronics categories and advertised in interactive publications such as Cosmopolitan, Good Housekeeping, and Marie Claire (Am. Compl. at ¶ 52.) and
- an aggressive print ad for the holiday season in such publications as Time, Newsweek, USA Today Weekend, Parade, LA Times Sunday Magazine, Ladies Home Journal, Popular Mechanics, Better Homes and Gardens, and U.S. News and World Report (Am. Compl. at ¶ 53.)

Next, Cybershop announced that ON24, Inc. selected it as one of the elite Network Economy stocks to own. (Am. Compl. at ¶ 56.) Chosen as a "core holding" for investors based on anticipated growth during the holiday season, the Company stated that it was picked by ON24's Editor–in–Chief as the "racing horse stock pick" that was "clearly going to benefit from the onset of the Christmas selling season." (Am. Compl. at ¶ 56.)

On December 23, 1999, the Company issued a press release reporting that "[e]arly financial data is encouraging, indicating solid year over year revenue growth and healthy gross margins." (Schiller Aff., Ex. 25.)

On February 1, 2000, the Company announced its unaudited financial results for the fourth quarter of 1999, reporting revenues double those earned in 1998: approximately $4.2 million for the quarter and $10 million net for the year. That announcement does not analyze the revenues earned respectively from each Cybershop division.

On February 10, 2000, the Company issued a press release over the Business Wire announcing that it was closing its e-tailing sites, CyberShop.com and electronics.net, and selling those operations' retail assets. (Am. Compl. at ¶ 65.) Announcing a change in its core strategy, the Company indicated that it would begin operating as an Internet incubator, GSV. (Am. Compl. at ¶ 65.) After this announcement, Cybershop's common stock price *increased.*

As a means to comply with generally accepted accounting principles ("GAAP") for reporting operations discontinued after the fiscal year's end, the Company issued on February 24, 2000, an Amended 10–Q for the quarter ending September 30, 1999. The Amended 10–Q reveals that sales of core operations, CyberShop.com, declined during the third quarter of 1999 twenty-eight percent in one year: "[r]evenues at-

tributable to CyberShop for the third quarter of 1999 totaled $358,000, as compared to $500,000 for the same period of 1998." (Am. Compl. at ¶ 66.) Cybershop did not make any other changes in its Amended 10–Q. Indeed, it reported the same consolidated gross revenues ($2,788,-000) as disclosed in its original Form 10–Q. (Schiller Aff., Ex. 3.)

That same day, the stock's market price increased. The stock closed at $3.9375 per share on February 24, 2000. (Am. Compl. at ¶ 67.) In fact, its closing price was higher than its opening price, and was also higher than its market price the previous day. And, indeed, the stock price continued to rise through February 28, 2000. By February 28, 2000, the stock price had increased 25% since Cybershop's February 24 announcement. Significantly, the parties do not dispute that the share price had continually increased through February 28. The stock closed at $4.875 per share on February 28. (Am. Compl. at ¶ 69.)

On February 29, 2000, the New York Times published an article entitled, "Can Cybershop Explain This To Investors?" (Am. Compl. at ¶ 68.) Its author reported that Cybershop's stock, which was trading at about $6 a share before the company's third quarter revenue announcement, "climbed to a high of $14.25 on Nov. 29 amid great optimism over the holiday shopping season." (Am. Compl. at ¶ 68.) Reporting that third quarter 1999 revenue results were essentially distorted, the author wrote that core business revenues had decreased twenty-eight percent on a year-to-year basis (Am. Compl. at ¶ 68), and that Cybershop had failed to disclose this decline in its third quarter 1999 reports. He further reported that substantial insider sales following the third quarter revenue announcement had taken place, and that those sales involved prices ranging from $10–$14 per share. (Am. Compl. at

¶ 68.) According to that writer, the Company was able to report for third quarter 1999 sales a 458% increase from the previous year due to an acquisition and a troubled joint venture.[3] (Schiller Aff., Ex. 10.)

When the market closed on February 29, 2000, the stock was trading at $3.9375 per share. (Am. Compl. at ¶ 69.) On March 1, 2000, just one day after the article appeared in the New York Times, Cybershop's stock price dipped to $2.9375 per share. (Am. Compl. at ¶ 69.)

On March 30, 2000, the Company filed its SEC 1999 annual report on Form 10–K. It revealed that its Tools for Living business generated three quarters of the Company's annual revenues, and that the defunct joint venture with Tops, electronics.net, had contributed the remaining 25% of total revenue growth in 1999. (Schiller Aff., Ex. 2.)

Plaintiff's complaint seeks damages based on two theories: (1) a violation of section 10(b) of the Exchange Act and Rule 10b–5, which was promulgated to effectuate section 10(b); and (2) a violation of section 20(a) of the Exchange Act based on the Individual Defendants' positions as "controlling persons" under that Act. In its First Claim, Plaintiff asserts that Defendants violated section 10(b) of the Exchange Act and Rule 10b–5 by making "various untrue and/or misleading statements of material facts and omit[ing] to state material facts necessary in order to make the statements made," (Am. Compl. at ¶ 82), and thus causing "the market price of the Company's common stock [to be] . . . artificially inflated during the Class Period," (Am. Compl. at ¶ 85.) Simply put, Plaintiff pleads damages under section 10(b) and Rule 10b–5 because

> Plaintiff and other members of the Class purchased or otherwise acquired Cybershop securities, relying upon the integrity of the market price of Cybershop stock and market information relating to Cybershop, or in the alternative, upon [D]efendants' false and misleading statements, and in ignorance of the adverse, undisclosed information known to [D]efendants.

(Am. Compl. at ¶ 89.) In its Second Claim, Plaintiff also seeks damages against the Individual Defendants under section 20(a) based on the fact that, [b]y virtue of their high-level positions, participation in, and/or awareness of the Company's operations and/or intimate knowledge of the Company's financial condition, operations, and prospects, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading. (Am. Compl. at ¶ 91.) Additionally, Plaintiff asserts that the Individual Defendants should be held liable since their "direct and supervisory involvement in the day-to-day operations" at Cybershop presumably makes them "controlling persons" for purposes of section 20(a) liability. (Am. Compl. at ¶ 93.)

Defendants filed this motion to dismiss under Rule 12(b)(6) of the Federal Rules

---

**3.** Defendants' brief in support of this motion criticizes Plaintiff's blind reliance on the February 29, 2000 New York Times article as the catalyst for this class action suit. Although the article appears to be rife with inaccuracies, the Court simply does not consider its content in deciding Defendants' motion to dismiss. For purposes of ruling on this 12(b)(6) motion, the Court relies only on those documents that are, indeed, "integral to" the complaint's allegations, *Burlington Coat*, 114 F.3d at 1426 (citation and quotations omitted), namely, documents reporting and commenting on Cybershop's raw data and calculations during the relevant time period.

of Civil Procedure. Defendants contend that: (1) Plaintiff has failed to sufficiently plead a false and misleading statement actionable under section 10(b) of the Exchange Act; (2) Plaintiff has failed to plead a false and misleading statement to sustain its claim under section 20(a) of the Exchange Act; (3) Plaintiff has neither satisfied the pleading standard for scienter under Rule 9(b) nor Reform Act pleading standards; (4) Plaintiff has failed to adequately plead a motive to commit fraud under Rule 9(b) and Reform Act pleading standards; (5) Plaintiff's alternative allegations of recklessness are equally insufficient under Rule 9(b) and Reform Act pleading standards; and (6) Plaintiff's amended complaint gives rise to no actionable claim based on the "safe harbor" provision, 15 U.S.C. § 78u–5(c), and the "information and belief" pleading standard, 15 U.S.C. § 78u–4.

At oral argument, Plaintiff conceded that it does not challenge as inaccurate Cybershop's reported figures. (T31 at 7–9.) Rather, Plaintiff argued that Cybershop falsely promoted their new business strategy as successful, albeit that it had not yet achieved success: "[T]he vast majority of the increase in revenues was due to Tools For Living and the discontinued electronics.net operations and not what they [Cybershop] were touting to the public, which was the Cybershop branded merchandise." (T33 at 18–23.)

## IV. Rule 12(b)(6) Standard

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss a complaint that fails "to state a claim upon which relief can be granted." In considering a Rule 12(b)(6) motion, a court accepts as true all of the factual allegations within the complaint and any reasonable inferences that may be drawn from them. *Hayes v. Gross,* 982 F.2d 104, 106 (3d Cir.1992).

Claims should be dismissed under Rule 12(b)(6) where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Though a court must take as true all facts alleged, it may not "assume that the [plaintiff] can prove any facts that it has not alleged." *Associated Gen. Contractors of Calif., Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). Further, on a 12(b)(6) motion, a court shall properly reject any "conclusory recitations of law" pled within the complaint. *Commonwealth of Pennsylvania v. PepsiCo, Inc.,* 836 F.2d 173, 179 (3d Cir.1988); *see Morse v. Lower Merion School Dist.,* 132 F.3d 902, 906 (3d Cir.1997) (noting that "a court need not credit a complaint's 'bald assertions' or legal conclusions' when deciding a motion to dismiss").

Accordingly, a district court reviewing the sufficiency of a complaint has a limited role. In performing that role, the court determines not "whether the plaintiffs will ultimately prevail," but "whether they are entitled to offer evidence to support their claims." *Langford v. Atlantic City,* 235 F.3d 845, 847 (3d Cir.2000); *see also In re Burlington Coat Factory Sec. Litig.* ("*Burlington Coat*"), 114 F.3d 1410, 1420 (3d Cir.1997); *Syncsort Inc. v. Sequential Software, Inc.,* 50 F.Supp.2d 318, 325 (D.N.J.1999); *In re MobileMedia Sec. Litig.,* 28 F.Supp.2d 901, 922 (D.N.J.1998). Generally, the court's task requires it to disregard any material beyond the pleadings. *Burlington Coat,* 114 F.3d at 1426; *Pension Benefit Guar. Corp. v. White Consol. Indus.,* 998 F.2d 1192, 1196 (3d Cir. 1993).

A district court may, however, consider the factual allegations within other documents, including those described or identi-

fied in the complaint and matters of public record, if the plaintiff's claims are based upon those documents. *Burlington Coat,* 114 F.3d at 1426; *In re Westinghouse Sec. Litig.* ("*Westinghouse*"), 90 F.3d 696, 707 (3d Cir.1996); *In re Donald Trump Sec. Litig.,* 7 F.3d 357, 368 n. 9 (3d Cir.1993); *Pension Benefit Guar. Corp.,* 998 F.2d at 1196. In other words, the court may review those such documents that are "integral to or explicitly relied upon in the complaint," *Burlington Coat,* 114 F.3d at 1426 (citation and quotations omitted), so as to avoid

> [t]he situation in which a plaintiff is able to maintain a claim of fraud by extracting an isolated statement from a document and placing it in the complaint, even though if the statement were examined in the full context of the document, it would be clear that the statement was not fraudulent.

*Id.* Yet just because the court elects under these circumstances to examine documents outside of the complaint does not mean that it need treat the motion as one for summary judgment. *Burlington Coat,* 114 F.3d at 1426; *Pension Benefit Guar. Corp.,* 998 F.2d at 1196–97.

## V. Section 10(b) Claim

Section 10(b) and Rule 10b–5 apply to "false or misleading statements or omissions of material fact that affect trading on the secondary market." *Burlington Coat,* 114 F.3d 1410, 1417 (3d Cir.1997); *see In re Campbell Soup Co. Sec. Litig.,* 145 F.Supp.2d 574, 583 (D.N.J.2001) ("*Campbell Soup*") (quoting *Burlington* for same proposition). Section 10(b) bans the "use or employ[ment], in connection with the purchase or sale of any security, ... [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). Applicable to section 10(b), Rule 10b–5 makes it

illegal "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading ... in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5(b); *see Campbell Soup,* 145 F.Supp.2d at 583.

A plaintiff must plead five elements to demonstrate a claim under Section 10(b) and Rule 10b–5: (1) defendant made a representation or omission of material fact; (2) scienter motivated defendant's representation or omission; (3) defendant made that representation or omission in the context of a securities purchase or sale; (4) plaintiff relied on defendant's representation or omission; and (5) plaintiff's reliance proximately caused damages. *E.g., EP MedSystems, Inc. v. EchoCath, Inc.,* 235 F.3d 865, 871 (3d Cir.2000) (citing *Weiner v. Quaker Oats Co.,* 129 F.3d 310, 315 (3d Cir.1997)); *In re Advanta Corp. Sec. Litig.* ("*Advanta*"), 180 F.3d 525, 537 (3d Cir. 1999) (citing *Westinghouse,* 90 F.3d 696, 710 (3d Cir.1996)).

A defendant can not be held liable for failure to disclose unless plaintiff first demonstrates that defendant, indeed, had a duty to disclose. *See Basic, Inc. v. Levinson,* 485 U.S. 224, 239 n. 17, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b–5."); *Campbell Soup,* 145 F.Supp.2d at 583 (citing *Basic* as support). But once a defendant makes a disclosure, that defendant must ensure that any disclosure is accurate. *Campbell Soup,* 145 F.Supp.2d at 583 (citation omitted). In Section 10(b) and Rule 10b–5 actions, "[a] statement is false or misleading if it is factually inaccurate, or additional information is required to clarify it." *In re Nice Sys., Ltd. Sec. Litig.* ("*Nice Sys.*"), 135 F.Supp.2d 551, 573 (D.N.J.2001) (citations

and quotations omitted); *Campbell Soup,* 145 F.Supp.2d at 583.

Not just any false or misleading statement gives rise to liability; instead, only a material representation or omission is actionable. *Basic,* 485 U.S. at 238, 108 S.Ct. 978; *Campbell Soup,* 145 F.Supp.2d at 583 (citing *Basic* ). Material information in the context of a 10(b)(5) case is "information that would be important to a reasonable investor in making his or her investment decisions." *Burlington Coat,* 114 F.3d at 1425; *Campbell Soup,* 145 F.Supp.2d at 583–84 (quoting *Burlington Coat,* 114 F.3d at 1425). "Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); *see Campbell Soup,* 145 F.Supp.2d at 584 (quoting *TSC Indus., Inc.,* 426 U.S. at 449, 96 S.Ct. 2126) (citation omitted). A material representation is different from both a subjective statement, including one expressing an opinion, motive, or intent, and a generally optimistic statement, otherwise known as "puffery." *Campbell Soup,* 145 F.Supp.2d at 584 (quotations and citations omitted). Reasonable investors interpret puffery as merely that and nothing more. *Id.* (quoting *EP MedSystems,* 235 F.3d at 872 (quoting *Advanta,* 180 F.3d at 538)).

An alternative standard exists for determining materiality in the context of an "efficient" market. *Burlington Coat,* 114 F.3d. at 1425; *Campbell Soup,* 145 F.Supp.2d at 584 (citations omitted). Since "efficient markets are those in which information important to reasonable investors ... is immediately incorporated into stock prices," it necessarily follows that "the concept of materiality translates into information that alters the price of the firm's stock" *Burlington Coat,* 114 F.3d at 1425 (citations omitted); *Campbell Soup,* 145 F.Supp.2d at 584 (quoting *Burlington Coat* for this proposition). "As a result, when a stock is traded in an efficient market, the materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following the disclosure, of the price of the firm's stock." *Campbell Soup,* 145 F.Supp.2d at 584 (quoting *Oran v. Stafford,* 226 F.3d 275, 282 (3d Cir.2000)).

## VI. Pleading Requirements—Rule 9(b) and the Private Securities Litigation Reform Act (the "Reform Act")

### 1. Rule 9(b)

Since Section 10(b) and Rule 10b–5 claims assert "fraud," a plaintiff alleging "false or misleading statements or omissions of material fact" must meet the heightened pleading requirements of both Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). 15 U.S.C. § 78u–4 *et seq.; Oran,* 226 F.3d at 288; *Advanta,* 180 F.3d at 530; *Campbell Soup,* 145 F.Supp.2d at 584 (citations omitted).

An exacting standard, Rule 9(b) prescribes that "[i]n all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). This heightened pleading requirement gives "defendants notice of the claims against them, provides an increased measure of protection for their reputations, and reduces the number of frivolous suits brought solely to extract settlements." *Burlington Coat,* 114 F.3d at 1418; *see Campbell Soup,* 145 F.Supp.2d at 584 (quoting *Burlington Coat* for this proposition).

So as to prevent defrauding parties from concealing fraudulent behavior, however, the ordinarily strict particularity standard is less rigorous 'where the factual information is peculiarly within the defendant's knowledge or control.' *Campbell Soup,* 145 F.Supp.2d at 584 (quotations and citations omitted). Still, even when relaxed, the Rule 9(b) standard does not tolerate mere boilerplate and conclusory allegations. A plaintiff must offer factual allegations that plausibly support the asserted legal theories within the complaint. *Id.* (quoting *Burlington Coat,* 114 F.3d at 1418 (citations omitted and italics omitted)).

## 2. Private Securities Litigation Reform Act

Reacting to conflict among the circuits concerning the appropriate pleading standard and to "an increasing number of frivolous 'strike suits' aimed at achieving quick settlements," Congress enacted the Reform Act in 1995 to add to the Rule 9(b) standard a " 'uniform and stringent pleading requirement.' " *Campbell Soup,* 145 F.Supp.2d at 584–85 (quoting S.Rep. No. 104–98, at 15 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 694). Under that Act, a complaint alleging Section 10(b) violations is insufficient unless it " 'specif[ies] each statement alleged to have been misleading, the reason or reasons why the statement is misleading and, if an allegation regarding the statement or omission is made on information and belief, ... state[s] with particularity all facts on which that belief is formed.' " *Campbell Soup,* 145 F.Supp.2d at 585 (quoting 15 U.S.C. § 78u–4(b)(1)); *see Advanta,* 180 F.3d at 530 (reciting this same standard). Thus, a court must examine carefully all fraud allegations in the complaint, reviewing each allegation separately. *Westinghouse,* 90 F.3d at 712; *Campbell Soup,* 145 F.Supp.2d at 585 (citing *Westinghouse* for this proposition).

## VII. Alleged Materially False and Misleading Statements

Plaintiff asserts that each of the following press releases, SEC filings, and statements is materially false and misleading.

### a. October 26, 1999 press release

Headlined as "CyberShop.com(R) Third Quarter Net Sales Increase Over 450% from the Prior Year with Strong Product Gross Margins of 34%," (Am. Compl. at ¶ 37), the October 26, 1999 press release reports the company's sales, losses, and growth potential:

CyberShop.com Reports Unique Visits Grew by 82% Over Previous Quarter

JERSEY CITY, N.J., Oct. 26/PRNewswire/—CyberShop.com(R), Inc. (NASDAQ: CYSP), a leading online retailer (*http://www.cybershop.com*) of brand name merchandise, announced today that its net sales of $2,788,000 for the third quarter of 1999, were up 458% from $500,000 in the third quarter of 1998 and up 35% from $2,067,000 in the second quarter of 1999. Gross margins for the quarter improved to 34% of net sales from 30% in the second quarter of 1999.

CyberShop.com experienced similar growth in unique visitor traffic, which increased to approximately 2 million, up 82% from 1.1 million in the second quarter of 1999. At the same time, CyberShop.com continued to maintain its focus on operating margins by generating $3.43 of revenue for each dollar spent on marketing in the third quarter of 1999.

CyberShop.com reported a third quarter pro forma net loss before merger and acquisition related costs of $1,412,000, or ($0.16) per share compared to a net loss of $1,153,000 or ($0.15) per share in the third quarter of 1998. Third quarter net loss, including merger and acquisi-

tion related costs, was $2,162,000 or ($0.25) per share.

"We are excited about the exceptional growth that CyberShop.com has already experienced in 1999," said Jeff Tauber, CEO and Chairman of the Board. "A number of successfully executed merchandising and marketing initiatives have helped us achieve rapid growth over the last three quarters. We are now gearing up for the upcoming holiday season with a host of online and offline initiatives to promote a number of hot products."

During the third quarter, Cybershop.com's customer count increased to 396,144. Cybershop.com processed approximately 15,000 orders with an $186 average order size. In preparation for the holiday season, Cybershop.com is carrying thousands of products and over 150 top brands, and has boosted its fulfillment and customer service capacity to process many more orders in preparation for the fourth quarter.

(Am. Compl. at ¶ 37.) Plaintiff alleges that these statements and financial results were "materially false and misleading and lacked any reasonable basis because, as defendants knew or recklessly disregarded, and failed to disclose to the investing public, product sales by the Company's CyberShop.com division during the third quarter of 1999 actually declined 28 percent from the same period a year earlier." (Am. Compl. at ¶ 38.) Plaintiff further alleges that those representations are actionable because the reported net sales increase resulted principally from revenues earned from Cybershop's Tools for Living division. (Am. Compl. at ¶ 38.) Additionally, Plaintiff claims that Tauber's statements within that press release indicate that he "knew, or recklessly disregarded, that revenues for the CyberShop.com division had actually declined

and that the increase in third quarter revenues was driven primarily by Cybershop's Tools for Living division." (Am. Compl. at ¶ 39.)

### b. November 5, 1999 press release

Cybershop's press release dated November 5, 1999, summarized Tauber's comments to a newspaper reporter. (Am. Compl. at ¶ 45.) According to that release, Tauber described the company's strategy for success:

> [T]o listen to your customers, the changes on the Internet are very rapid. When we started this business we were a full price retailer, today Cybershop.com is an off-price retailer competing against TJX [the publicly-traded parent of TJ Max and Marshall's] ... providing consumers a better way to buy brand name apparel at deep discounts. The new business model has been in place for a little more than two quarters with great success. In the second quarter we did roughly $2 million with a 30% gross margin, which is four times last year, and in our third quarter we did $3 million with a 34% gross margin. The 34% gross margin could be double that of the next online retailer.

(Am.Compl.¶ 45.) That press release further recites Tauber's statements concerning Cybershop's approach to attracting customers, to making acquisitions, and to dealing with future challenges:

> Jeff Tauber explains that CyberShop.com reaches its customers through what he calls 'a triple whammy.' 'First, we reach customers through online ads with portal deals such as Yahoo!, AOL, Microsoft and Inktomi. Second, we do off-line print ads, primarily in magazines, such as People, Time, Newsweek, Parade, Ladies Home Journal, and Better Homes and Garden. The third component is word of mouth and we do a

great deal of email marketing, public relations and affiliate programs.'

When asked about future acquisitions, Jeff Tauber said[,] 'We made a very important acquisition in June with Tools[-]for[-]living.com and we will continue to look for more acquisitions. We have two criteria for acquisitions'. First, does it add a product category that we don't currently have on our sites. Second, is it a company that financially has done a great job since we don't want to acquire a company that has huge cash burn rates because we want to move towards profitability as quickly as possible.

Jeff Tauber thinks the big challenge going forward will be the fourth quarter. He says, 'the fourth quarter can represent over 50% of our business and we are very focused on making sure that our systems are robust enough to handle traffic, our marketing plans are in place, and we picked the right products. Right now we are expecting an enormous fourth quarter and its very exciting. We are not only leveraging our expertise picking toys, we will run Pokemon and Sega Dreamcast, we also have some great apparel items and a china pattern from Spode. We are ready.' What should investors look for when investing in CyberShop.com? Jeff explains[,] 'One of the most critical elements when looking at an online retailer is gross margin; you can't acquire customers at any cost. We are very focused on gross margin because we believe ultimately that gross margin is the way we will reach profitability. Investors also have to look at marketing dollars spent. Last quarter we generated $3.40 of revenue for every marketing dollar spent. We believe we have one of the best executed sites, its simple, its easy to find products and checkout. And of course we have a management team with over 100 years of merchandising experience. We are going after a big market segment. Off-price retail business is a $27 billion industry and we believe we are poised to capture a big portion of that business online.'

(Am. Compl. at ¶ 45.)

Plaintiff claims that these statements "were materially false and misleading because as defendants knew, or recklessly disregarded, the Company's Cyber-Shop.com division had actually experienced a decline in revenues in the third quarter of 1999 as compared to the same period a year earlier." (Am. Compl. at ¶ 46.) Further, Plaintiff contends that Tauber's expectations for an "enormous fourth quarter" and his statement that Cybershop was "poised to capture a big portion of [the off-price retail business] online" were false and misleading because he knew or recklessly disregarded that sales of Cyber-Shop.com's core business actually declined 28 percent from a year earlier. (Am. Compl. at ¶ 46.)

*c. November 12, 1999 Form 10–Q report*

In its Form 10–Q report for the 1999 third quarter, which Tauber signed, Cybershop allegedly "repeated the materially false and misleading statements concerning revenue growth as it made in its October 26, 1999 press release." Specifically, Plaintiff alleges that Cybershop made the following misrepresentations:

Results of Operations Three Months Ended September 30, 1999 compared to Three Months Ended September 30, 1998.

Revenues: Revenue is comprised of sales of products, net of returns, outbound shipping and handling charges, advertising and vendor set-up fees. Total revenues increased 458% in the third

quarter, or $2,288,000, to $2,788,000 as compared to $500,000 in the third quarter of 1998. This increase was primarily attributable to greater marketing efforts, an expanded customer base, repeat purchases from existing customers, acquisitions, and strong sales of four products, which represented approximately 45% of total revenues in the three months ended September 30, 1999. Advertising and set-up fees decreased by 73%, or $22,000, to $8,000 in the third quarter of 1999 from $30,000 in the third quarter of 1998, as a result of a decrease in emphasis on this revenue stream and an increased focus on the Company's merchandising strategies.

(Am. Compl. at ¶ 50.) Plaintiff claims that these statements conveyed falsely that "greater marketing efforts, an expanded customer base, and repeat purchases from existing customers" had a greater impact on the increased revenues than Cybershop's acquisition activities, relying on the fact that, as Cybershop ultimately disclosed, more than half of revenues generated in the third quarter 1999 came from the Magellan Group, Inc., which Cybershop had acquired in June 1999. (Am. Compl. at ¶ 51.)

### d. November 22, 1999 announcement

Cybershop announced that it had launched for the holiday season an aggressive print ad in publications including *Time, Newsweek, USA Today Weekend, Parade, LA Times Sunday Magazine, Ladies Home Journal, Popular Mechanics, Better Homes and Gardens, and U.S. News and World Report.* (Am. Compl. at ¶ 53.) Tauber commented, "[t]he print ads will allow us to reach millions of consumers to uniquely feature our hot holiday products ... We believe we have the right combination of online and offline marketing to promote our merchandise and our brand for this holiday season...." (Am.

Compl. at ¶ 53.) Plaintiff asserts that Tauber's statement was "materially false and misleading" because Tauber knew or recklessly disregarded the fact that the "Cybershop.com division had experienced a substantial decline in revenues during the third quarter of 1999, and the division's poor financial performance was continuing throughout the fourth quarter." (Am. Compl. at ¶ 54.)

### e. November 27, 1999 statement

On November 26, 1999, Cybershop announced that ON24, Inc., a streaming media network for investors, named its stock as one of the elite Network Economy stocks to own. (Am. Compl. at ¶ 56.) Its stock joined ranks with AT & T, Qwest Communications, Yahoo!, Intel, AOL, Cisco, Amazon, Ebay, and Adaptec. (Am. Compl. at ¶ 56.) It reported that ON24 selected the company as a "core holding" for investors based on anticipated growth during the holiday season. (Am. Compl. at ¶ 56.) Cybershop stated that ON24's Editor–in–Chief identified it as the "racing horse stock pick," explaining that the stock was well off its 52 week high and "clearly going to benefit from the onset of the Christmas selling season." (Am. Compl. at ¶ 56.)

Commenting on ON24's decision selecting Cybershop, Tauber stated, "[w]e are excited our stock has been chosen by ON24.com and believe it further illustrates the strength of our company ... We are well prepared for 'the holiday season and believe it will clearly differentiate us as the leader in our segment of online retail.'" (Am. Compl. at ¶ 57.) Plaintiff claims that Tauber's statement was materially false and misleading because

[D]efendant Tauber knew, or recklessly disregarded, that at the time he made the statement the Company's core business revenues were actually declining.

Based on the Company's actual third quarter financial results, Tauber had no reasonable basis for his belief that the holiday season would differentiate Cybershop as the leader in its segment of online retail.

(Am. Compl. at ¶ 58.) Further, Plaintiff alleges that "ON24's selection of Cybershop was based, in substantial part, on defendants' materially false and misleading statements concerning the purported success of the Company's online retail business, CyberShop.com." (Am. Compl. at ¶ 58.)

### f. December 23, 1999 press release

A press release dated December 23, 1999, reports that "[e]arly financial data is encouraging, indicating year over year revenue growth and healthy gross margins. According to a recent *Business Week* article, 'E–Tailers with high gross margins are likely to survive the cyberwars.'" (Am. Compl. at ¶ 60.) That press release quotes Tauber as stating, "'[w]e are very pleased with our performance to date and our ability to increase our margins throughout the year ... Our infrastructure was well prepared for the added volume, our web servers, fulfillment operations, and customer service all rose to the occasion.'" (Am. Compl. at ¶ 60.)

Plaintiff contends that these representations were materially false and misleading because Cybershop knew or recklessly disregarded that it "was not, in fact, experiencing revenue growth on a year-to-year basis." (Am. Compl. at ¶ 61.) Plaintiff claims that, instead, the majority of Cybershop's 1999 revenues resulted from its Tools for Living division (formerly Magellan), which Cybershop did not acquire until June 1999. (Am. Compl. at ¶ 61.) "Irrespective of its gross margins, the Company's Cybershop.com division was generating only half the sales as compared to the same period the prior year." (Am. Compl. at ¶ 61.)

### g. February 1, 2000 announcement

On February 1, 2000, Cybershop announced its unaudited financial results for the fourth quarter of 1999: approximately $4.2 million in quarterly revenues and $10 million in net revenues for the year 1999. (Am. Compl. at ¶ 62.) These figures were double those from 1998. (Am. Compl. at ¶ 62.) The Company reported that it expected operating losses to decline approximately 30% for the quarter as compared to the previous year. (Am. Compl. at ¶ 62.) Commenting on the 1999 financial results, Tauber said: "We are pleased with our financial performance and believe our balanced approach in growing our business towards profitability versus growth at any cost will allow us to build a more sustainable business model long term...." Tauber further commented, "We believe that growth at any cost is unsustainable for any dot com, and are very pleased with the way our marketing drove traffic and sales for the holiday selling season ... Ultimately, we were able to show significant top line growth while not sacrificing the bottom line."

Plaintiff claims that the February 1, 2000 announcement and Tauber's responses to that announcement were "materially false and misleading" because "the increase in revenues for 1999 was primarily attributable to its Tools for Living division, which contributed $5,298,000 or 75% of total revenues in 1999, and also to the growth of electronics.net which contributed $1,721,000 or 25% of total revenues in 1999." (Am. Compl. at ¶ 64.)

## VIII. The Allegations in the Amended Complaint Fail to Give Rise to any Section 10(b) Claim under the Exchange Act

### a. False and Misleading Statements

The Court, as it must on this motion, has considered each allegedly false

and misleading statement pled in the amended complaint. Scrutinizing each separately and independently from another, the Court finds that Plaintiff cannot prove any set of facts that would entitle it to relief based on a 10b–5 claim. From a review of the statements made within the press releases and other public announcements, *see, e.g., Burlington Coat,* 114 F.3d at 1426; *Westinghouse,* 90 F.3d at 707; *In re Donald Trump Sec. Litig.,* 7 F.3d at 368 n. 9 (recognizing that a court may rely on factual allegations pled in other documents in reviewing a 12(b)(6) motion where a party's claims arise from those documents, and thus they are "integral to" the complaint), the Court finds that Plaintiff cannot make a threshold showing that Cybershop made a material representation or omission, the first element of any 10b–5 action. *Campbell Soup,* 145 F.Supp.2d at 583 (citations omitted).

Conceivably, Cybershop could have offered investors additional, clarifying information to explain that Tools for Living transactions contributed substantially to revenues earned. *See Nice Sys.,* 135 F.Supp.2d at 573. But even if Cybershop had provided that information, it is, nevertheless, immaterial to reasonable investors for two reasons. First, the information concerning Tools for Living would not have meaningfully changed the total mix of information available to a reasonable investor. *See Campbell Soup,* 145 F.Supp.2d at 584 (citations and quotations omitted). With or without that information, reasonable investors would have interpreted identically Cybershop's overall earnings and share price. Importantly, Plaintiff concedes that it does not, and can not, challenge the accuracy of the reported revenues. It is undisputed that the financial results reported in the Amended 10–Q for the quarter ending September 30, 1999, mirrored those reported in the earlier Form 10–Q. Cybershop did not file the Amended 10–Q to retract its earlier revenue totals. Rather, the Amended 10–Q was filed, consistent with GAAP, to reflect the effect of operations discontinued after the fiscal year end. Cybershop also broke out the results for each of the company's four web sites in the Amended 10–Q; it had no duty to earlier do so. *See Gilford Partners, L.P. v. Sensormatic Elecs. Corp.,* 1997 WL 570771, at * 17 n. 16 (N.D.Ill. Sept. 10, 1997) (noting that where a company complies with GAAP and applicable accounting guidelines, plaintiff must plead facts establishing why such reporting was still materially false and misleading). Further, the Court finds that Cybershop did not fail to disclose that "more than half of revenues generated in the third quarter [of] 1999 came from the Magellan Group, Inc. which the Company acquired in June 1999." (Am. Compl. at ¶ 51.) Not only had market investors learned of that acquisition in Cybershop's June 1999 press release, but they had been informed of the Magellan revenue source through the third quarter Form 10–Q, which disclosed that Magellan's results were "included in the Company's consolidated financial results beginning on the date of acquisition." (Schiller Aff., Ex. 3 at 5.)

Moreover, since the parties agree that efficient market principles apply, the Third Circuit requires the Court to recognize that materiality in the context of an "efficient" market "translates into information that alters the price of the firm's stock." *Burlington Coat,* 114 F.3d at 1425; *see Campbell Soup,* 145 F.Supp.2d at 584 (quoting *Burlington Coat* for the same proposition). Indeed, this is not a case in which a company withheld information and, as a result, its actions caused investors to lose money when the share price decreased. Put another way, investors' concerns regarding the market value of

their Cybershop common stock would not have been different had they learned more information regarding the Tools for Living division. The information relevant to Cybershop's Tools for Living division was immaterial to the price of Cybershop's stock. The price of Cybershop shares, in fact, increased steadily from February 24, 2000 through February 28, 2000, the four day period following all of the company's relevant disclosures. It is undisputed that the stock only decreased after the New York Times article appeared on February 29, 2000. Interestingly, that article questions revenues that even the parties here do not challenge. Additionally, the Court notes that Cybershop did not make any representations, let alone misrepresentations, regarding the cybershop.com website in its first Form 10–Q or in any of the allegedly false press releases, statements, or announcements.

Second, Plaintiff can not prove a material misrepresentation or omission because the allegedly false statements are, indeed, opinions or general statements of optimism, and cannot be construed fairly as anything more than mere puffery. *See Campbell Soup*, 145 F.Supp.2d at 584 (quotations and citations omitted). Critically, Tauber's statements concern Cybershop's future prospects, yet do not portend future earnings or other projections. At most, Tauber and other Cybershop representatives made optimistic, possibly even ambitious, statements that are necessarily immaterial as a matter of law, *see Advanta*, 180 F.3d at 538 (holding that general statements of optimism, "even if arguably misleading, do not give rise to a federal securities claim because they are not material."), even if they reflect "misguided optimism," *Nice Sys.*, 135 F.Supp.2d at 575.

For example, though alleged to be false and misleading, these statements reflect "puffery":

● "Right now we are expecting an enormous fourth quarter and it is very exciting.... Off-price retail business is $27 billion industry and we believe we are poised to capture a big part of that business online." Amended Complaint at ¶ 45.

● In announcing an agreement with Merrill Lynch's e-Shopping channel, Mr. Tauber said, "[w]e are very excited about this deal and believe Merrill e-Shopping customers will have a higher propensity to transact and to shop online, driving our top line growth and increasing margins by lowering our customer acquisition costs." Amended Complaint at ¶ 49.

● "The print ads will allow us to reach millions of consumers to uniquely feature our hot holiday products.... We believe we have the right combination of online and offline marketing to promote our merchandise and our brand for this holiday season." Amended Complaint at ¶ 53.

These statements, as Defendants correctly observe, were made when the company's sales and revenues had been increasing steadily from quarter to quarter; thus, the company was then reasonably optimistic about its future performance. *See Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 642 n. 19 (3d Cir.1989) (noting that a history of operations may provide a reasonable basis for management projections). Significantly, too, the parties do not dispute that all past financial data statements are accurate, and thus do not give rise to liability under 10b–5. *See Advanta*, 180 F.3d at 538; *Milestone Scientific*, 103 F.Supp.2d at 458.

■ Additionally, the Court determines that Plaintiff has not pled a cognizable 10b–5 claim against either Phillips or Leist. Neither Phillips nor Leist made any allegedly false statements or signed

any allegedly false documents. These two parties can not be linked to the alleged misconduct merely because they held corporate positions at relevant times in this litigation. *See Marra v. Tel–Save Holdings, Inc.*, 1999 WL 317103, at *3–5 (E.D.Pa. May 18, 1999) (determining that the Reform Act requires that a securities fraud complaint identify the material misrepresentations made by each of the defendants, and not merely lump them all together). The claims against them thus fail.

### b. Loss Causation

■ Plaintiff's 10b–5 claims also fail to survive this 12(b)(6) motion because it has not, and cannot, plead facts proving the requisite loss causation. A plaintiff must prove the "act or omission of the defendant ... caused the loss for which the plaintiff seeks to recover damages" under the Reform Act. 15 U.S.C. §§ 78u–4(b)(4); *see Hartman v. Blinder*, 687 F.Supp. 938, 940, 942–43 (D.N.J.1987) (dismissing 10(b) claims for failure to allege loss causation). Proof of loss causation is required so as not to "transform the defendant into an insurer of the stock, a result which is contrary to the purpose of the federal securities laws." *Wiley v. Hughes Capital Corp.*, 746 F.Supp. 1264, 1294 (D.N.J. 1990). Though Plaintiff alleges that the market for Cybershop stock was efficient and that "if the market had known the truth concerning the source of the Company's 1999 third quarter revenues, the price of its common stock would have been adversely impacted," (Am. Compl. at ¶¶ 21–23, 39–40), those allegations lack factual basis. The stock price did not drop after investors first received notice of the principal source of those third quarter revenues through the Amended 10–Q. Indeed, the stock price continuously increased through the market's closing hour on February 28, 2000. It did not decline until February 29,

2000, immediately after the suspect New York Times Article appeared. Absent the requisite causal nexus between Cybershop's allegedly misleading conduct and a measurable decrease in share price, Plaintiff's 10b–5 claim must be dismissed on Defendants' motion. *See Semerenko v. Cendant Corp.*, 223 F.3d 165, 185 (3d Cir. 2000)("Where the value of the security does not actually decline as a result of an alleged misrepresentation, it cannot be said that there is in fact an economic loss attributable to that misrepresentation.")

### c. Absent a cognizable claim under 10b–5, Plaintiff cannot succeed under section 20(a) of the Exchange Act

■ Plaintiff claims that Defendants Tauber, Philips, and Leist are secondarily liable for Cybershop's alleged misrepresentations under Section 20(a), which creates liability for "controlling persons" in a corporation, 15 U.S.C. § 78t(a). (Am. Compl. at ¶¶ 91–92.) Specifically, Plaintiff alleges that their roles as directors and/or officers gave them "supervisory involvement in the day-to-day operations," and create a presumption that they "control[led] ... the transactions giving rise to the securities violations." (Am. Compl. at ¶¶ 91–92.)

These allegations are entirely ineffective. Since the amended complaint fails to establish any primary violation of the Exchange Act, secondary liability under section 20(a) does not attach. *See Milestone Scientific*, 103 F.Supp.2d at 474. While a section 20(a) claim requires a party to plead more than just a primary violation, *see Nice Sys.*, 135 F.Supp.2d at 588 (articulating elements that plaintiff must satisfy under section 20(a)), the Court finds it futile to probe further that analysis. Defendants' motion to dismiss the § 20(a) claims is thus granted.

## IX. Plaintiff Does Not Satisfy Rule 9(b) and Reform Act Pleading Standards for Drafting the Amended Complaint

Plaintiff not only fails to plead a material misrepresentation or omission attributable to any Defendant, but also omits the requisite particularity under Rule 9(b) and the Reform Act for pleading fraud. Section 10(b) allegations must meet the strict pleading requirements of Rule 9(b). *Advanta*, 180 F.3d at 532. The requisite "strong inference" of fraud "may be established either (a) by alleging facts to show that the defendant had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* at 534. Supplementing Rule 9(b), the Reform Act requires a plaintiff, "with respect to *each* act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that ... [each] defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2) (emphasis added). This requirement is not, to put it mildly, lightly regarded in securities fraud cases. *Oran*, 226 F.3d at 288.

### a. Lacking Proof of the Individual Defendants' Motive to Commit Fraud, Plaintiff Has Not Pled the Requisite Scienter

Essentially, Plaintiffs seek damages based on the theory that the Individual Defendants artificially inflated Cybershop's stock price so that they could sell stock before the company disclosed unfavorable information in the Amended 10–Q. Lacking facts establishing each of the Individual Defendant's motive to commit fraud, however, the amended complaint disregards well-settled pleading standards. Additionally, the amended complaint does not even allege that Leist sold any shares. While Plaintiff pleads that Tauber and Phillips sold shares at critical times, that fact, even when assumed true, does not alone establish fraud. *See Advanta*, 180 F.3d at 540 (recognizing that insider sales that occur before a stock price declines do not alone give rise to an inference of fraud.); *see also Burlington Coat*, 114 F.3d at 1424 (observing that such inference would be wholly improper because "[a] large number of today's corporate executives are compensated in terms of stock and stock options. It follows, then, that these individuals will trade in those securities in the normal turn of events."); *Milestone Scientific*, 103 F.Supp.2d at 471 (rejecting a claim that a fraudulent motive may be inferred where company's CEO sold his stock before the company disclosed adverse information because "the proceeds [of the transactions] were the result of accumulated stock options and were an intended part of [the executive's] overall compensation.") Moreover, both Phillips and Tauber sold shares of their stock, but those sales affected minimally their overall holdings. (Schiller Aff. at Ex. 6, 7, 9); *see Advanta*, 180 F.3d at 540–41 (declining to infer fraud from the fact that insiders sold stock, particularly where those sales represented only minimal percentages of their holdings.). Indeed, even after his November 1999 stock sales, Tauber remained the company's single largest shareholder with over 2 million shares. (Schiller Aff. at Ex. 6, 9); *see Advanta*, 180 F.3d at 540–41 (finding that, "[f]ar from supporting a strong inference that defendants had a motive to capitalize on artificially inflated stock prices," the fact that "defendants continued to hold a sizeable percentage of [the Company's] stock even after their [sales] suggest they had every incentive to keep [the Company] profitable."); *Burlington Coat*, 114 F.3d at 1423.

Contrary to Plaintiff's allegations, the timing of Tauber's sales raises no particular suspicion. "[O]nly if such sales were unusual in scope or timing" might they be so suspect as to imply scienter. *Nice Sys.*, 135 F.Supp.2d at 583 (quoting *Oran*, 226 F.3d at 280) (citations omitted). In fact, Tauber sold his stock one month after the company reported its third quarter results and before fourth quarter results were known. Additionally, he sold stock during the same week in both 1998 and 1999, and, in fact, sold 200,000 shares at a far higher price in 1998. (Schiller Aff., Ex. 30.) In short, neither the timing of Tauber's sales nor the amount of shares sold establishes an inference of fraud.

Furthermore, Plaintiff has not met its pleading burden in alleging that Cybershop's Officers and Directors signed public statements and were well informed of the company's regular business. (Am. Compl.¶ 73.) This is because "[a]llegations that a director or officer signed public disclosures and/or was involved in the company's daily operations, standing alone, will not satisfy the pleading requirements of the PSLRA or Rule 9(b)." *In re Cendant Corp. Sec. Litig.*, 76 F.Supp.2d 539, 547 (D.N.J.1999); *see Advanta* 180 F.3d at 539 (holding that mere assertion that a defendant was an officer or director with access to unidentified, confidential information is insufficient to plead fraud); *Milestone Scientific*, 103 F.Supp.2d at 470 ("[G]eneralized imputations of knowledge do not suffice, regardless of the position of the defendant within the company."). The risk, of course, is that if such bald allegations sufficiently establish fraud, then virtually all corporate directors or executives will presumptively possess fraudulent intent. *In re Health Mgmt. Inc. Sec. Litig.*, 970 F.Supp. 192, 205 (E.D.N.Y.1997).

Overall, Plaintiff pleads no facts demonstrating that the Individual Defendants acted with scienter. Absent a showing of scienter then, Plaintiff's amended complaint cannot survive this 12(b)(6) motion.

**b. Plaintiff's Alternative Allegations of Recklessness are Insufficient to Establish Scienter**

■ Alternatively, Plaintiff claims that Defendants acted with such extreme recklessness that conscious misbehavior should be inferred. Amended Complaint at ¶¶ 38, 39, 46, 51, 54, 58, 61, 64, 82, 84. Recklessness is defined as "an extreme departure from the standard of ordinary care ..., which presents a danger of misleading that is either known to the defendant or is so obvious that the actor must be aware of it." *Advanta*, 180 F.3d at 535. "Conscious behavior in this sense refers to 'intentional fraud or other deliberate illegal behavior.'" *Milestone Scientific*, 103 F.Supp.2d at 454. Absent "strong circumstantial evidence" of scienter, a party cannot establish recklessness. *Acito v. IMC-ERA Group Inc.*, 47 F.3d 47, 52 (2d Cir. 1995). The Amended Complaint contains no allegations of fact, much less particularized facts, that might show that each, or any, of the Individual Defendants acted recklessly. Aside from the fact that Cybershop is not responsible for any material misstatements of omissions, it voluntarily filed an Amended 10–Q in February 2000. The Court agrees with Defendants that Cybershop's amended filing does not reflect recklessness, let alone intentional fraud. The Company acted so as to timely comply with GAAP standards, not to mislead or deceive.

In examining the amended complaint, the Court further finds that Plaintiff's theory that Defendants acted recklessly in making optimistic statements about the future when they knew otherwise fails. "Where plaintiffs contend defendants had access to contrary facts, they must specifi-

cally identify the reports or statements containing this information." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir.2000); *Milestone Scientific*, 103 F.Supp.2d at 465. But Plaintiff does not plead those facts in the amended Complaint. That pleading does not identify a single fact or internal report indicating that the 1999 holiday season would not be strong or that Defendants had the foresight to know in November 1999 that the company's e-tailer business would fail. To be sure, Defendants cannot be found reckless based sheerly on hindsight. As a final observation, the Court agrees with Defendants that basic logic dictates against a finding that the company misled investors concerning third quarter results only to reveal its plan a few short months later. *See Shields v. Citytrust Bancorp. Inc.*, 25 F.3d 1124, 1130 (2d Cir.1994). If this were true, as Defendants point out, the Individual Defendants likely would have been selling stock through March 2000 and unlikely would have issued the Amended 10–Q.

Having found that Plaintiff's Amended Complaint fails to plead any cause of action for a securities violation under 10b–5 and also fails to satisfy the Rule 9(b) and Reform Act pleading standards, the Court need not address Defendants' alternative arguments that Plaintiff's failure to satisfy other Reform Act pleading requirements also warrants a dismissal. (Def.'s Br., Pt. IV.)

## X. Plaintiff is not Entitled to Leave to Amend its Pleading

■ Though it fails to specify how it would amend its pleading so as to withstand a motion to dismiss under Rule 12(b)(6), Plaintiff contends that the Court, alternatively, should dismiss without prejudice the amended complaint and grant leave to amend its pleading. (Pl.'s Oppos. Mem. at 39 n. 21.) Defendants oppose

leave to amend as a futile exercise that would thwart the interests of justice. (Defs.' Reply Br. at 11.) They additionally point out that Plaintiff had an opportunity to revise its pleading when the Court consolidated this matter. (Defs.' Reply Br. at 11.)

The Court agrees. Plaintiff has already had its proverbial "second bite at the apple." Originally, the parties filed thirteen complaints. At a case conference on the matter, the Court directed Plaintiff to proceed no further until they reviewed Cybershop's annual report for its discussion of the New York Times article at issue in the case. Presumably, Plaintiff read that report. After the Court appointed their lead counsel, Plaintiff filed the consolidated amended class action complaint that is the subject of this motion.

Ever mindful that leave to amend is ordinarily granted, *see* Fed.R.Civ.P. 15(a), the Court finds that any likely amendment will not cure the deficiencies plaguing the amended complaint. *See Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (explaining that it is within the court's discretion to deny leave to amend for undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice to non-moving party or futility of amendment); *In re Champion Enter., Inc., Sec. Litig.*, 145 F.Supp.2d 871, 872 (E.D.Mich.2001) (citing *Foman* for same proposition). Plaintiff has failed to proffer any proposed, substantive amendment that would satisfy applicable pleading requirements; indeed, it does not suggest any amendment at all. Plaintiff had ample opportunity to craft a sufficiently pled complaint when the Court directed it to review the annual report, consolidated the thirteen pending cases into this single class action, and ordered the lead Plaintiff to file an amended class action complaint.

Moreover, the Court finds that leave to amend is improper because the Reform Act restricts Rule 15 in securities cases. *In re Champion Enter.*, 145 F.Supp.2d at 872. Essentially, the Reform Act would be "meaningless" if judges liberally granted leave to amend on a limitless basis:

> If the Reform Act is read to mean that when a complaint is filed under the Reform Act, a judge must scrutinize the complaint and advise the pleader where the complaint is deficient, and then give the pleader an opportunity to amend the complaint, and when that is done, the judge must again, perhaps like a law school professor, advise the pleader that he or she has not passed the test, and if not, give the pleader another opportunity to meet the heightened pleading requirements, and even after that, still another opportunity, if the pleader requests it, then the Reform Act is meaningless. If this is the interpretation of the Act, then Rule 15 always trumps the plain requirements of the Act, and what Congress did when it passed this act over a presidential veto, means nothing.

*Id.; see In re: NAHC, Inc.*, 2001 WL 1241007 at *26 (E.D.Pa. Oct. 17, 2001) (agreeing with *In re Champion Enter.* that Congress deliberately set higher burdens on plaintiffs in pleading securities fraud actions 'to provide a filter at the earliest stage (the pleading stage) to screen out lawsuits that have no factual basis.' (quotations omitted)).

Thus, to prevent futile amendments and to preserve the integrity of the Reform Act, the Court denies Plaintiff leave to amend its amended complaint.

## XI. Conclusion

For all of the foregoing reasons, the Court dismisses with prejudice Plaintiff's consolidated class action complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. An appropriate order follows.

Before the Court is Defendants' motion for dismissal of the consolidated amended complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Plaintiff has opposed this motion. For the reasons set forth in the accompanying written opinion,

**IT IS** on this ___ day of March 2002

**ORDERED** that Defendants' motion for dismissal under Rule 12(b)(6) is **GRANTED,** and it is further

**ORDERED** that this dismissal shall be **with prejudice**.

This case is closed.